NATIONAL AVIATION, a general
partnership dba National Air
Freight, et al., Plaintiffs,

v.

The CITY OF HAYWARD,
CALIFORNIA, Defendant.

No. C–75–2279 RFP.

United States District Court,
N. D. California.

July 13, 1976.

William A. Jennings, Glynn P. Falcon, Jr., LaCroix & Schumb, San Jose, Cal., for plaintiffs National Aviation, et al.

Peter W. Davis, Michael R. Silvey, Crosby, Heafey, Roach & May, Oakland, Cal., John W. Scanlon, City Atty., Hayward, Cal., for defendant City of Hayward.

Alvin J. Rockwell, Gordon E. Davis, Brobeck, Phleger & Harrison, San Francisco, Cal., for amicus curiae Air Transport Ass'n of America.

John S. Yodice, Washington, D.C., for amicus curiae Aircraft Owners & Pilots Ass'n.

## OPINION

PECKHAM, Chief Judge.

This is an action by four related commercial airplane operators who seek to have Hayward City Ordinance 75-023 C.S. declared unconstitutional. That ordinance, enacted on October 14, 1975, pursuant to defendant Hayward's capacity as proprietor of the Hayward Air Terminal, prohibits all aircrafts which exceed a noise level of 75 dBA from landing or taking off from the Hayward Air Terminal between the hours of 11:00 p. m. and 7:00 a. m.[1]

On November 3, 1975, this court denied plaintiffs' application for a temporary restraining order. Thereafter, on January 12, 1976, the court heard argument on plaintiffs' motion for a preliminary injunction and defendant's motion to dismiss. At that time, we granted leave to the Air Transport Association of America to file a brief as an amicus curiae and took the foregoing motions under submission pending the filing of the amicus and necessary reply briefs by

1. The ordinance provides an exception for emergency flights approved by the Air Terminal Manager or in his absence by his designee. Hayward Municipal Code § 2-6.119(1)(c).

the parties.[2] Accordingly, these briefs having been submitted, we now turn to the disposition of the motions before us.

## I. PRELIMINARY INJUNCTION

 This circuit employs two tests for determining whether a party is entitled to a preliminary injunction: "One moving for a preliminary injunction assumes the burden of demonstrating *either* a combination of probable success and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor." *Wm. Inglis & Sons Baking v. I.T.T. Cont. Baking Co.*, 526 F.2d 86, 88 (9th Cir. 1975) *quoting from Charlie's Girls Inc. v. Revlon Inc.*, 483 F.2d 953, 954 (2d Cir. 1973) (emphasis added by Ninth Circuit). Since it is clear that the balance of the parties' relative hardships does not tip sharply in plaintiffs' favor, if at all in their direction,[3] plaintiffs must satisfy the standards of the first test if a preliminary injunction is to issue.

### A. *Irreparable Injury*

 Plaintiffs National Aviation (dba National Air Freight) and Paramount Air Services Inc. are under contract with Peninsula Air Delivery Inc. to transport and deliver cargo consisting of mail and the latest edition newspapers for morning delivery to various interstate and intrastate destinations. The nature of this contract requires these plaintiffs to operate their aircrafts during the hours of 11:00 p. m. and 7:00 a. m.; and in the past, these plaintiffs have operated such flights from Hayward Airport. However, as a result of Hayward City Ordinance 75–023 C.S., these plaintiffs

have been required to shift their operations to other airports, primarily Oakland Airport, thereby allegedly incurring large increases in their costs of operation.

Plaintiff Career Aviation is an FAA approved flight training school and conducts flight training at the Hayward Air Terminal. It is occasionally required to conduct flight training operations between the hours of 11:00 p. m. and 7:00 a. m. Due to the passage of ordinance 75–023 C.S., this plaintiff alleges that it is no longer able to conduct its flight training sessions during those hours. Thus, Career's flight training instruction and aircraft rental and sales are alleged to have been adversely affected in varying degrees, not yet calculable.

Moreover, in addition to these alleged increases in operating expenses, plaintiffs allege to have suffered other damage not readily translatable to dollar amounts. These include reductions to the net worth of these companies (thereby placing them in less favorable positions with their banks and other capital lending institutions), loss of value of their leased property and facilities at the Hayward Air Terminal, decreased and less flexible service capabilities to customers, loss of goodwill, and the potential of criminal prosecution of their pilots and employees should those persons unsuccessfully attempt to comply with the ordinance's noise standards.

Although plaintiffs could probably be compensated for a great deal of this injury by an award of money damages, much of the injury which plaintiffs claim to suffer would be very difficult to calculate precisely so that it is doubtful whether plaintiffs

---

**2.** The Amicus Brief of the Air Transport Association of America was filed February 11, 1976. On March 1, 1976, the Aircraft Owners and Pilots Association petitioned the court for leave to file an amicus brief and on March 2, 1976, filed such a brief with the court. Leave to file such a brief is now hereby granted. Defendants filed a "Reply Memorandum" to Air Transport's Amicus Brief on March 8, 1976, which prompted plaintiffs to file a letter of reply of its own on April 5, 1976. Finally, on April 27, 1976, defendants responded to plaintiffs' letter of April 5, 1976.

**3.** Plaintiffs essentially argue that the enactment of Hayward City Ordinance 75–023 C.S. has increased their operating costs and reduced their corporate net worth. *See* § I(A) *infra*. Defendant City of Hayward takes the position that enjoining the enforcement of this ordinance will entail great social costs in the form of noise pollution affecting hundreds of residents living in the vicinity of Hayward Air Terminal, as well as possible financial liability for the city by way of a suit in inverse condemnation. *See Griggs v. Allegheny County*, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962).

have a fully adequate remedy at law. Even more persuasive on this point is defendant's argument that it is completely immune from damage liability in this case. *See* section II *infra*. Accordingly, we are of the opinion that these plaintiffs have made an adequate showing of the "possibility" that they will be "irreparably injured." [4] *See Charlie's Girls Inc. v. Revlon Inc., supra.* Accordingly, we now turn to an examination of plaintiffs' likelihood of success on the merits.

## B. *The Merits*

■ Plaintiffs and amicus primarily argue that the Hayward ordinance is unconstitutional because (1) it invades a field preempted by federal law and (2) because it imposes an unconstitutional burden on interstate commerce. In addition, plaintiffs argue that a preliminary injunction should issue because the ordinance is contrary to prior federal agreements. We will consider these arguments seriatim.

1. *Preemption.* Plaintiffs and amicus contend that the Noise Control Act of 1972, 42 U.S.C. § 4901 *et seq.*, as it amends the Federal Aviation Act of 1958, 49 U.S.C. § 1301 *et seq.*, and the regulations promulgated thereunder [5] preempt the area of noise regulation and render the Hayward ordinance unconstitutional. The leading case on this question is *Burbank v. Lockheed Air Terminal*, 411 U.S. 624, 93 S.Ct.

1854, 36 L.Ed.2d 547 (1973). *Burbank* involved a city ordinance which imposed a "curfew" that, in the absence of an emergency, prevented any pure jet aircraft from taking off from privately owned Hollywood-Burbank Airport between the hours of 11:00 p. m. and 7:00 a. m. Mr. Justice Douglas, writing for a 5–4 majority, conducted a detailed analysis of the aforementioned statutes, their legislative history, and the play of the rationale of *Rice v. Santa Fe Elevator Corporation*, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), and concluded that the "pervasive nature of the scheme of federal regulation of aircraft noise" constituted preemption. 411 U.S. at 633, 93 S.Ct. at 1859.

A critical piece of legislative history upon which the *Burbank* opinion turned consists of a letter by the Secretary of Transportation to the Aviation Subcommittee of the Senate Committee on Commerce addressing the question of whether the Noise Control Act of 1972 would "to any degree preempt State and local government regulation of aircraft noise and sonic boom." The part of the letter upon which the majority relied read as follows:

> The courts have held that the Federal Government presently preempts the field of noise regulation insofar as it involves controlling the flight of the aircraft. . . . H.R. 3400 would merely expand

---

**4.** Plaintiff Midwest Air Charter claims to be adversely affected by the passage of ordinance 75–023 C.S. because of its intentions, prior to the passage of the ordinance, to utilize the Hayward Air Terminal as an arrival and departure point for some of its interstate flights. These allegations are not sufficient to constitute the requisite degree of irreparable injury required for a preliminary injunction to issue in this party's favor.

**5.** Basically the Noise Control Act of 1972, "by amending § 611 of the Federal Aviation Act, also involves the Environmental Protection Agency (EPA) [and FAA] in the comprehensive scheme of federal control of the aircraft noise problem." "EPA shall submit to FAA proposed regulations to provide such 'control and abatement of aircraft noise and sonic boom' as EPA determines is 'necessary to protect the public health and welfare.' FAA is directed within 30 days to publish the proposed regula-

tions in a notice of proposed rulemaking. Within 60 days after that publication, FAA is directed to commence a public hearing on the proposed rules . . . [and] within 'a reasonable time after the conclusion of such hearing and after consultation with EPA,' FAA is directed either to prescribe the regulations substantially as submitted by EPA, or prescribe them in modified form, . . ." *Burbank v. Lockheed Air Terminal*, 411 U.S. 624, 628–630, 93 S.Ct. 1854, 1857–1858, 36 L.Ed.2d 547 (1973).

The regulations that have been promulgated under this authority now appear at 14 C.F.R. Part 36. *See also* note 12 *infra*. In addition, the FAA has adopted rules and regulations which control the flight of aircraft (14 C.F.R. Parts 91, 93, 95 and 97) and which govern the use of navigable airspace (14 C.F.R. Parts 71, 73, 75 and 77).

the Federal Government's role in a field already preempted. It would not change this preemption. State and local governments will remain unable to use their police powers to control aircraft noise by regulating the flight of aircraft. [411 U.S. at 635, 93 S.Ct. at 1860.]

The letter, however, also expressed the view that

the proposed legislation [would] not affect the rights of a State or local public agency, *as the proprietor of an airport,* from issuing regulations or establishing requirements as to the permissible level of noise which can be created by aircraft using the airport. Airport owners acting as proprietors can presently deny the use of their airports to aircraft on the basis of noise considerations so long as such exclusion is nondiscriminatory. [411 U.S. at 635–36 n. 14, and at 649, 93 S.Ct. at 1861.]

Just as an airport owner is responsible for deciding how long the runways will be, so is the owner responsible for obtaining noise easements necessary to permit the landing and takeoff of the aircraft. The Federal Government is in no position to require an airport to accept service by larger aircraft and, for that purpose, to obtain longer runways. Likewise, the Federal Government is in no position to require an airport to accept service by noisier aircraft, and for that purpose to obtain additional noise easements. The issue is the service desired by the airport owner and the steps it is willing to take to obtain the service. In dealing with this issue, the Federal Government should not substitute its judgment for that of the States or elements of local government who, for the most part, own and operate our Nation's airports. The proposed legislation is not designed to do this and will not prevent airport proprietors from excluding any aircraft on the basis of noise considerations. [411 U.S. at 649, 93 S.Ct. at 1867 (emphasis added).] [6]

Accordingly, the *Burbank* court's finding of preemption was made only with regard to a nonproprietor municipality's attempt to regulate aircraft noise pursuant to its police power. Indeed, in footnote 14 of the majority opinion, Mr. Justice Douglas expressly acknowledges that the court "do[es] not consider here what limits, if any, apply to a municipality as a proprietor." 411 U.S. at 635–36 n. 14, 93 S.Ct. at 1161. As a result, this court must now attempt to do so. We begin with an examination of the ordinance in question.

Section 2 of the Hayward City Ordinance 75–023 recites that the City of Hayward as the owner, operator, and proprietor of an airport located within its corporate limits, possesses the authority to adopt reasonable rules regulating the use of such airport. Nevertheless, the ordinance appears to greatly resemble a measure that a municipality would pass pursuant to its police power. It was enacted as an amendment to the Municipal Code, by the Hayward City Council, and subjects violators to criminal penalties of six months in jail and/or a $500.00 fine. The ordinance further states that it was passed in order to preserve "the public peace, health, and safety in order to provide relief from noise pollution to occupants of residential property surrounding the Hayward Air Terminal."

Thus, it seems clear that if this ordinance was passed by a state or other local government not the proprietor of the airport, it would run afoul of *Burbank* and would constitute an impermissible exercise of police power in an area preempted by Congress. The question presented here is whether the City of Hayward's status as proprietor of the Hayward Air Terminal leaves the city free to exercise its police powers without constraint by federal preemption. While at first blush the answer to this question would appear to be "no," at least one court seems to indicate otherwise.

*Air Transport Association v. Crotti,* 389 F.Supp. 58 (N.D.Cal.1975) involved the con-

---

**6.** In their report concerning this legislation, the Senate Commerce Committee expressly indicated their concurrence with these views. Sen. Rep.No.1353, 90th Cong.2d Sess., 6–7; U.S. Code Cong. & Admin.News 1968, p. 2688.

stitutionality of Title 4, California Administrative Code, Subchapter 6, §§ 5000–5080.5, which, pursuant to the authority of the Public Utilities Code, §§ 21699–21699.5, set particular noise standards to govern the operation of aircraft at all airports operating under a permit from the California Department of Aeronautics. Specifically, the standards fell into two categories:

> (a) CNEL (Community Noise Equivalent Level) standards, prescribed for continued operation of airports with monitoring requirements, which focus upon the arrival of a prescribed ultimate maximum noise level and limiting the land uses subjected thereto around airport facilities; and (b) SNEL [sic] (Single Event Noise Exposure Levels) prohibitions applied to the inseparable feature of noise generated by an aircraft directly engaged in flight.

389 F.Supp. at 62.

The *Crotti* three-judge court upheld the CNEL standards, but declared the SENEL provisions to be an unlawful exercise of police power. Significantly, in rejecting plaintiff Air Transport Association of America's argument that the federal government had preempted the entire field of airport noise regulation, the court wrote:

> It is now firmly established that the airport proprietor is responsible for the consequences which attend his operation of a public airport; his right to control the use of the airport is a necessary concomitant, whether it be directed by state police power or his own initiative. . . *That correlating right of proprietorship control is recognized and exempted from judicially declared federal pre-emption by footnote 14.* [389 F.Supp. at 63–64 (emphasis added) (footnote omitted).]

Indeed the only regulation promulgated to date by the FAA pursuant to its authority to "prescribe and amend such regulations as [it] may find necessary to provide for the control and abatement of aircraft noise and sonic boom" (49 U.S.C. § 1431(b)(1)) is Part 36 of the Federal Aviation Regulations, 14 C.F.R. § 36.1 *et seq.* But even the FAA in its original preface to Part 36 disclaimed that it was intending to preempt noise control regulation and emphasized that local airport owners have the responsibility for determining the permissible noise levels for aircraft using their airport:

> Compliance with Part 36 is not to be construed as a Federal determination that the aircraft is "acceptable" from a noise standpoint in particular airport environments. Responsibility for determining the permissible noise levels for aircraft using an airport remains with the proprietor of that airport. The noise limits specified in Part 36 are the technologically practicable and economically reasonable limits of aircraft noise reduction technology at the time of type certification and are not intended to substitute federally determined noise levels for those more restrictive limits determined to be necessary by individual airport proprietors in response to the locally determined desire for quiet and the locally determined need for the benefits of air commerce. [34 Fed.Reg. 18355.][7]

Thus, the import of *Burbank* and the legislative history discussed therein, as well as the nature of the subsequent noise regulations implemented by the FAA, is, as the *Crotti* court stated, that the right of airport proprietorship control is recognized and exempted from preemption. Such an interpretation does, however, overlook the explicit statement of the *Burbank* majority

---

7. In the present regulations promulgated by the FAA, § 36.5 reads as follows:

§ 36.5 Limitation of part

Pursuant to 49 U.S.C. 1431(b)(4), the noise levels in this part have been determined to be as low as is economically reasonable, technologically practicable, and appropriate to the type of aircraft to which they apply. *No determination is made, under this part, that*

*these noise levels are or should be acceptable or unacceptable for operation at, into, or out of any airport.* (Emphasis added.)

In addition, the FAA specifically requires that in the airplane flight manual for each aircraft certified under Part 36, whether jet or small propeller, that the statement underscored above be furnished near the listed noise levels.

that the court was not considering "what limits, if any, apply to a municipality as a proprietor." 411 U.S. at 635–36 n. 14, 93 S.Ct. at 1861. Moreover, the *Crotti* court's interpretation of Burbank would produce a result, which plaintiffs strenuously contend would be anomalous; namely, that a municipality that owns an airport would be free to exercise police powers in the field of airport noise regulation which powers, if identically exercised by a different municipality or state, would unlawfully intrude into an area said to have been preempted by Congress.[8]

Therefore, we cannot merely rely on the *Crotti* court's interpretation of this problem. Rather, we must examine further to see whether Congress or the Supreme Court ever intended such a result.

As indicated previously, Justice Douglas based his finding of preemption on "the pervasive nature of the scheme of federal regulation of aircraft noise. 411 U.S. at 633, 93 S.Ct. at 1859. More specifically, he wrote:

The Federal Aviation Act requires a delicate balance between safety and efficiency, 49 U.S.C. § 1348(a), and the protection of persons on the ground. 49 U.S.C. § 1348(c). Any regulations adopted by the Administrator to control noise pollution must be consistent with the "highest degree of safety." 49 U.S.C. § 1431(d)(3). The interdependence of these factors requires a uniform and exclusive system of federal regulation if the congressional objectives underlying the Federal Aviation Act are to be fulfilled.

If we were to uphold the Burbank ordinance and a significant number of municipalities followed suit, it is obvious that fractionalized control of the timing of take-offs and landings would severely limit the flexibility of FAA in controlling air traffic flow. The difficulties of scheduling flights to avoid congestion and the concomitant decrease in safety would be compounded. [411 U.S. at 638–39, 93 S.Ct. at 1862 (footnotes omitted).]

Thus, to allow municipal airport proprietors to restrict the use of their facilities by imposing jet curfews or other noise regulations would certainly undermine the rationale underlying Justice Douglas' finding of preemption. This is particularly so in light of the fact that most of the airports in this country are owned by the municipalities in which they are located.

However, the majority was well aware of this fact, as well as of the clear Congressional intention that airport proprietors continue to be permitted to deny the use of

---

8. Indeed amicus Air Transport Association of America contends that the Hayward ordinance is invalid under the *Crotti* decision's holding that the SENEL standards, at issue there, were preempted. Those standards measured the noise exposure level of a single event, such as an aircraft flyby. Under the statutory scheme that *Crotti* invalidated, the proprietor of an airport was to recommend single event noise exposure level limits appropriate to his airport, which, upon approval, were to be enforced by the county in which the airport was located. 4 Cal.Admin.Code § 5035. Operation of an aircraft in excess of those limits was punishable as a misdemeanor. 4 Cal.Admin.Code § 5055.

Amicus argues that by enacting its own ordinance, Hayward set its own single event limit and instead of recommending it to the state for approval, provided for its own enforcement. In all other respects, amicus contends that the effect of the Hayward ordinance is identical with the SENEL limits enjoined in *Crotti*. Both schemes, for example, subject aircraft operators to criminal penalties for operating in excess of the noise limits in effect.

Amicus notes that Hayward could have proceeded to recommend establishment of a noise limit for approval by the county. In so doing, Hayward would have run afoul of the injunction issued against SENEL enforcement by *Crotti*. Although that injunction only runs to the SENEL procedure, amicus rhetorically questions whether the result should be any different when the city does not seek state approval of the noise limit and attempts to enforce the limit itself? If the city cannot propose a noise limit for criminal enforcement by the county, can it logically adopt a limit to be enforced by its own police power?

Defendant responds affirmatively. It distinguishes *Crotti* on the grounds that the SENEL procedure was neither imposed by a proprietor (but the state) nor was enforced by an owner (but the county). Defendant contends that the logic of amicus' argument makes sense only if one denies the existence of the airport owner exception, which so clearly appears in the legislative history and the case law.

their airports to aircraft on the basis of noise considerations so long as such exclusion was nondiscriminatory. See 411 U.S. at 635 n. 14, 93 S.Ct. 1854.[9] The rationale underlying this special treatment for airport proprietors can be traced to another Justice Douglas opinion—*Griggs v. Allegheny County,* 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962).

*Griggs* held that an airport operator is financially responsible to nearby property owners for property damage resulting from aircraft noise from overflying commercial flights. The court held that such noise constituted a "taking" of an "air easement" over the property of the plaintiff. The court viewed the county's obligation to obtain air easements as just another part of its responsibility to acquire sufficient land for the airport pursuant to its power of eminent domain. Significantly, the court rejected the contention that it was the United States government that should be liable for the "taking," having required the airport to have been constructed according to federal requirements and having guaranteed through the Federal Aviation Act a "public right of freedom of transit in air commerce through the navigable air space." See 369 U.S. at 93–94, 82 S.Ct. at 535 (Black, J., dissenting).

Thus, this court finds itself caught on the horns of a particularly sharp dilemma: If on one hand, we follow the dicta in footnote 14 of the *Burbank* opinion, which is intended to comport with the court's holding in *Griggs,* we will severely undercut the rationale of *Burbank's* finding of preemption. If on the other hand, we disregard the proprietor exception as dicta in order to fully effectuate the *Burbank* rationale, we

impose upon airport proprietors the responsibility under *Griggs* for obtaining the requisite noise easements, yet deny them the authority to control the level of noise produced at their airports. This is, of course, exactly what the Senate Commerce Committee indicated that the 1972 amendment to section 611 of the Federal Aviation Act was *not* intended to do. *See* Senate Report No. 1353, 90th Cong., 2d Sess. pp. 6–7.

In the opinion of this court, it is ultimately this clear expression of legislative intent which must control our decision, for, to echo the analysis of Justice Douglas, when "congress legislate[s] in a field which the States have traditionally occupied. . . . [the] powers of the States [are] not to be superseded by the Federal Act unless that [is] the clear and manifest purpose of Congress. . . ." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Accordingly, while the Congressional purpose was undoubtedly clear enough to the *Burbank* majority to rule that a municipality's police power regulations regarding aircraft noise at an airport, which it was not the proprietor of, invaded an area exclusively reserved for federal control,[10] this court cannot, in light of the clear Congressional statement that the amendments to the Federal Aviation Act were not designed to and would not "prevent airport proprietors from excluding any aircraft on the basis of noise considerations,"[11] make the same finding with respect to regulations adopted by municipal airport proprietors. If Justice Douglas' comments regarding the need for an "uniform and exclusive system of federal regulation" prove correct, Congress and the FAA can take the appropriate steps to provide such a regulatory system.[12] However,

---

**9.** See also, 411 U.S. at 651–652, 93 S.Ct. 1854 (Rehnquist, J., dissenting).

**10.** In addition to Justice Douglas' view that the scheme of federal regulation was pervasive, the majority relied upon statements by the Solicitor General and the Senate Commerce Committee to the effect that "as respects 'airspace management' there is pre-emption" (411 U.S. at 627, 93 S.Ct. at 1856) and that the proposed legislation "would not change this preemption. State and local governments will remain unable

to use their police powers to control aircraft noise by regulating the use of the aircraft." (Sen.Rep.No.1353, 90th Cong., 2d Sess., 6–7).

**11.** Sen.Rep.No.1353, 90th Cong., 2d Sess., 7; U.S.Code Cong. & Admin.News 1968, p. 2694.

**12.** Indeed, we understand that the FAA is presently in the process of studying four potential policy options in this area: (1) Airport proprietor actions unconstrained by FAA; (2) Airport proprietor completely constrained by FAA with

at the present time, Congress and the FAA do not appear to have preempted the area, and therefore, the City of Hayward, as proprietor of Hayward Air Terminal, cannot be enjoined from enforcing ordinance 75–023 C.S. on preemption grounds.[13] Nor do we think that this ordinance can be enjoined under the "Commerce Clause."

■ 2. *The Commerce Clause.* There is some question as to the exact test that should be used to determine whether a local legislative enactment's effect on an area of interstate commerce, which has not been preempted by Congressional legislation, is violative of the Commerce Clause. *See*

*Procter and Gamble Company v. City of Chicago,* 509 F.2d 69, 75 (7th Cir. 1975). However, it is clear that the first question to be determined is whether there is an effect on interstate commerce for if there is no effect, there is no need for further inquiry. Assuming that there is an effect, the next issue is whether the legislative body "has acted within its province, and whether the means of regulation chosen are reasonably adapted to the end sought." *S. C. Highway Dep't v. Barnwell Bros.,* 303 U.S. 177, 190, 58 S.Ct. 510, 517, 82 L.Ed. 734 (1938). The inquiry here also focuses on whether the legislative action discriminates

a correlated development of a federal airport noise abatement plan; (3) Airport proprietor to establish a noise abatement plan; and (4) Continue the present policy of emphasizing ongoing efforts to reduce aircraft noise at its source through the development of appropriate technology as well as the development of noise abatement procedures. Under this final alternative, "the FAA would neither support nor oppose restrictions placed on the use of an airport to provide noise relief except where the restrictions constitute an undue burden on interstate commerce, or unjust discrimination or interfere with aircraft operating procedures or the management and control of navigable airspace." *See* Department of Transportation Memo, 40 Fed.Reg., Part 132 (July 9, 1975).

13. There is some discussion in the briefs of striking down only that part of the Hayward ordinance which imposes a criminal penalty upon persons who violate the ordinance. The theory that apparently lies behind this suggestion is that this would more fully effectuate the *Burbank* holding that municipalities are preempted from regulating aircraft noise pursuant to their police powers. While this suggestion has a certain amount of appeal as a compromise solution to a difficult problem, further reflection militates against its acceptance.

Underlying the *Burbank* court's finding of preemption was Justice Douglas' perception of the need for a uniform and exclusive system of federal aircraft noise regulation. 411 U.S. at 638–39, 93 S.Ct. 1854. Justice Douglas feared the fractionalized control of the timing of takeoffs and landings which might result if a significant number of municipalities enacted noise curfews like that of Burbank's. *Id.* Yet, as is set forth in the body of this opinion, Congress clearly intended that municipal airport proprietors issue regulations and establish requirements as to the permissible level of noise which could be created by aircrafts using the airports. See 411 U.S. 635–36 n. 14, 93 S.Ct. 1854. While, as acknowledged previously, giving ef-

fect to this Congressional intention, as this court has chosen to do here, will certainly undercut the *Burbank* finding of preemption to some extent; but, declaring that municipal airport proprietors can issue noise regulations, yet not enforcing the violation of those regulations with criminal penalties, would do nothing to further effectuate the *Burbank* rationale.

Congress was concerned with *who* could regulate aircraft noise and not with the *manner* in which such regulations were promulgated or enforced. Thus, Congress recognized that municipal airport proprietors (but not other municipalities) were responsible for obtaining noise easements necessary to permit the landing and takeoff of aircrafts, and accordingly intended to preserve the concomitant right of those proprietors to exclude any aircraft on the basis of noise considerations. *See* 411 U.S. at 649, 93 S.Ct. 1854.

In the instant case, it appears that Hayward chose to regulate the level of aircraft noise at Hayward Air Terminal by the passage of a city ordinance only because that was the manner in which Hayward regulated all facets of its airports (Hayward Municipal Code §§ 2–6.51—2–6.150), its parks (§§ 2–6.10—2–6.16), its libraries (§§ 2–6.02—2–6.05) and all other public facilities. Moreover, the misdemeanor sanction for violation of ordinance 75–023 C.S. appears to have been included solely because any person violating any provision of the Hayward Municipal Code is by its very terms guilty of a misdemeanor. Hayward Municipal Code § 1–3.00.

Under these circumstances, we see no purpose in striking down the criminal penalty provision of Hayward ordinance 75–023 C.S., and thereby forcing the city to enforce its regulations, where necessary, by use of a civil injunction, the violation of which would result in a finding of contempt, and in all probability, a penalty closely approximating the one presently provided for.

against interstate commerce. *Id.* at 189, 58 S.Ct. 510. It is after this point, though, where there appears to be some conflict in the analysis to be used.

There is some support for the proposition that once it is determined that the legislation is a reasonable means of achieving a nondiscriminatory, legitimate goal, it should be deemed constitutional without need for further inquiry. *See Brotherhood of Locomotive Firemen & Enginemen v. Chicago, Rock Island & Pacific Railroad Co.,* 393 U.S. 129, 89 S.Ct. 323, 21 L.Ed.2d 289 (1968); *S. C. Highway Dep't v. Barnwell Bros., supra.* However, the test more frequently employed by the Supreme Court requires that the burden imposed on interstate commerce be further balanced against the local interest supporting the legislation in order to determine the ultimate question of constitutionality. *See, e. g., Bibb v. Navajo Freight Lines,* 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959); *Southern Pacific Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). The Supreme Court's most recent formulation of this standard appeared in *Pike v. Bruce Church Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970):

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.

Efforts to reconcile these two differing standards usually focus on one of two circumstances which could preclude the need for "balancing." One circumstance present in *Barnwell Bros., supra,* was that the regulation in question was said to be of "peculiarly local concern":

> Ever since *Willson v. Black-Bird Creek Marsh Co.,* 2 Pet. 245, [7 L.Ed.2d 412] and *Cooley v. Board of Port Wardens,* 12 How. 299, [13 L.Ed. 996], it has been recognized that there are matters of local concern, the regulation of which unavoidably involves some regulation of inter-

state commerce but which, because of their local character and their number and diversity, may never be fully ·dealt with by Congress. Notwithstanding the commerce clause, such regulation in the absence of Congressional action has for the most part been left to the states
> . . ..
>
> . . . .
>
> . . . Few subjects of state regulation are so peculiarly of local concern as is the use of state highways. There are few, local regulation of which is so inseparable from a substantial effect on interstate commerce. Unlike the railroads, local highways are built, owned and maintained by the state or its municipal subdivisions.
>
> . . . [R]egulations of the use of highways are akin to local regulation of rivers, harbors, piers and docks, quarantine regulations, and game laws, which, Congress not acting, have been sustained even though they may materially interfere with interstate commerce. [303 U.S. at 185, 187–188, 58 S.Ct. at 513, 515 (footnotes omitted).]

A second circumstance, at play in *Brotherhood, supra,* involved the propriety of weighing conflicting evidence regarding the ultimate value of the challenged legislation. The Court said:

> [T]he question of safety in the circumstances of this case is essentially a matter of public policy, and public policy can, under our constitutional system, be fixed only by the people acting through their elected representatives. The District Court's responsibility for making "findings of fact" certainly does not authorize it to resolve conflicts in the evidence against the legislature's conclusion or even to reject the legislative judgment on the basis that without convincing statistics in the record to support it, the legislative [judgment] constitutes nothing more than . . . "pure speculation."

393 U.S. at 138, 139, 89 S.Ct. at 328.[14]

---

14. *See also S. C. Highway Dep't v. Barnwell Bros.,* 303 U.S. at 190–91, 58 S.Ct. 510. *But*

*see Southern Pacific Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945).

While in the instant case, there is no question regarding the ultimate value or purpose of the Hayward ordinance, proprietary noise control of airports could be said to be a matter of "peculiarly local concern." In *Huron-Portland Cement Co. v. Detroit,* 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960), the Court noted that the problem of air pollution is "peculiarly a matter of state and local concern" and upheld the constitutionality of Detroit's Smoke Abatement Code, finding that it did not discriminate against interstate commerce. There also appears to be ample evidence in the *Burbank* opinion, and the legislative history discussed herein, from which a similar conclusion could be drawn with respect to the control of airport noise. However, we need not decide this issue because in our view the Hayward ordinance could not be invalidated even under the more stringent "balancing" standard.

Plaintiffs argue that the Hayward ordinance burdens interstate commerce by forcing them to make their flights from Oakland Airport rather than Hayward Air Terminal, thereby impairing their ability to deliver the mail and newspapers to customers in California and other nearby states. However, it appears from the record, that plaintiffs have had little problem in successfully shifting their operations, where necessary, to the Oakland Airport and that they are still delivering the same newspapers and cargos out of state that they did before the ordinance was enacted.[15] Moreover, there is evidence to indicate that at least some of plaintiffs' planes can comply, and

have complied, with the 75 dBA noise level set by the Hayward ordinance.[16] Thus, any effect on interstate commerce produced by the ordinance seems to be incidental at best and clearly not excessive when weighed against the legitimate and concededly laudable goal of controlling the noise levels at the Hayward Air Terminal during late evening and morning hours.[17]

Perhaps recognizing this, the real thrust of plaintiffs and amicus' argument is directed at the potential for conflicting legislation which itself is alleged to constitute an impermissible burden on interstate commerce. The cases, however, on which plaintiffs and amicus rely upon to support this argument all involve instances in which the regulations in question either conflicted with existing federal legislation or regulations, or invaded an area preempted by Congress. *See Lockheed Air Terminal v. City of Burbank,* 318 F.Supp. 914 (C.D.Cal. 1970) aff'd *without reaching commerce clause issue,* 457 F.2d 667 (9th Cir. 1972), 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973); *American Airlines Inc. v. City of Audubon Park,* 297 F.Supp. 207 (W.D.Ky. 1968) aff'd 407 F.2d 1306 (6th Cir. 1969); *American Airlines Inc. v. Town of Hempstead,* 272 F.Supp. 226 (E.D.N.Y.1967) aff'd *without reaching commerce clause issue* 398 F.2d 369 (2d Cir. 1968); *All American Airways v. Village of Cedarhurst,* 106 F.Supp. 521 (E.D.N.Y.1952); aff'd sub nom. *Allegheny Airlines v. Village of Cedarhurst,* 238 F.2d 812 (2d Cir. 1956). Significantly, while the District Court's holding on the commerce clause in *Burbank* was not reached in

---

15. *See, e. g.,* Affidavit of Peter W. Davis, filed January 8, 1976, pp. A6, A11.

16. *See* Affidavit of Armin T. Wright filed January 8, 1976; Affidavit of William W. Schofield filed January 8, 1976, pp. A18–A19.

17. The only evidence that plaintiffs have offered the court regarding the burden on interstate commerce which has been imposed upon them as a result of defendant's ordinance consist of vague and conclusory allegations in three affidavits filed by Messrs. Reese, K. Robinson and R. Robinson. The evidence set forth in these affidavits is accurately summarized in

the sixth paragraph of plaintiffs' March 31, 1976, letter to the court:

> [P]laintiffs are regularly engaged in the interstate transportation of perishable cargos, Federal Reserve bank deposits, late edition newspapers and United States mail. . . . The affidavits previously filed herein . . . state the involvement of these plaintiffs in interstate commerce [and] . . . also state that plaintiffs have been adversely affected in their interstate transport of the above items and that their business has declined as a result of this ordinance.

the affirmances of the Ninth Circuit or the Supreme Court, Mr. Justice Rehnquist, in a dissenting opinion in which three other members of the court joined, labelled that holding of "questionable validity" ·noting that "the proper determination of the question turns on an evaluation of the facts of each case, [citing], *Bibb v. Navajo Freight Lines,* 395 U.S. 520, [79 S.Ct. 962, 3 L.Ed.2d 1003] (1959)." 411 U.S. at 654, 93 S.Ct. at 1869. Indeed, in *Huron-Portland Cement Co. v. City of Detroit, supra,* the Court noted that while appellant had argued that other local governments might impose differing requirements as to air pollution, it had pointed to none, and accordingly rejected appellant's commerce clause argument. *See also Procter and Gamble Co. v. City of Chicago, supra,* 500 F.2d at 77.

As in *Huron-Portland Cement,* the record here contains "nothing to suggest the existence of any such competing or conflicting local regulation." 362 U.S. 448, 80 S.Ct. at 819. While plaintiffs point to the fact that Oakland Airport has received a complaint from the City of Alameda regarding excessive noise on runway 15, defendant has submitted the affidavit of Francis H. Witcomb, Manager of the Oakland Metropolitan Airport, which is set forth in relevant part in the margin below,[18] and which indicates that Oakland has no plans to enact an ordinance for the Oakland Airport similar to that of the Hayward ordinance.[19]

To summarize then, on the record before us there is insufficient evidence from which to conclude that the Hayward ordinance is presently imposing anything but an "incidental" burden on interstate commerce. The possibility that other municipalities will sometime in the future enact similar ordinances, which will together then create an impermissible burden on interstate commerce is mere speculation. Accordingly, this court cannot enjoin enforcement of Hayward ordinance 75–023 C.S. on commerce clause grounds.

■ 3. *Breach of Prior Federal Agreements.* The Hayward Air Terminal was originally an Army Air Corps field that.was quit-claimed to the City of Hayward in 1946 with provisions *inter alia* that the airport "shall prevent any land use either within or outside the boundaries of the airport . . [which would] limit its usefulness as an airport." These requirements have also been periodically restated in agreements for federal funding of projects at the Hayward Air Terminal, such as the Airport and Airway Development Plan grants, *see* 49 U.S.C. §§ 1713–1719, from which Hayward has received substantial amounts of money.

Plaintiffs argue that Hayward ordinance 75–023 C.S. contravenes the provisions in these various federal agreements and that there never would have been any need for the ordinance had Hayward complied with the provisions which require the city to

18. " . . . I recollect that a noise complaint had been received from the city of Alameda concerning noise on the southern tip of the main island of the City of Alameda. I surmised that that noise may have been caused by aircraft using Runway 15–33, although the noise could have been caused by aircraft using Runways 9–27 Right or 9–27 Left, or the noise could have been caused by overflights of aircraft not using the Oakland Airport. Although National Aviation's use of these three Oakland Airport North Field Runways could potentially lead to noise complaints, its use of the South Field Runway 11–29 greatly reduces or eliminates that possibility. National Aviation has, in fact, used Runway 11–29 and its operations have produced no noise complaints.
3. In making this affidavit, I also reviewed the Affidavit of Robert H. Brydon, dated February 26, 1976, and I agree that the operations conducted by National Aviation during the night-

time hours generally between the hours of midnight and 3:00 a. m. did not interfere with the normal use and operation of the Oakland Airport by scheduled air carriers which serve Oakland Airport.
4. At the present time, the Port of Oakland has no plans of which I am aware, for enacting an ordinance for the Oakland Airport similar to the Hayward ordinance which I have reviewed, and which would restrict aircraft operations of the type conducted by National Aviation from the Oakland Airport."

19. It does not appear that the voluntary jet takeoff ban which Oakland Airport is reported to have instituted with respect to certain of its northern runways affect plaintiffs' aircrafts. Moreover, there is no evidence that this voluntary program will hamper plaintiffs' aircrafts from using that airport's southern runways.

attempt to provide for land use that will be compatible with the airport.

At the outset, we note that there are serious questions as to plaintiffs' standing as third party beneficiaries to raise these claims. *Compare Port of New York Authority v. Eastern Air Lines,* 259 F.Supp. 745 (E.D.N.Y.1966); *City and County of San Francisco v. Western Air Lines,* 204 Cal.App.2d 105, 22 Cal.Rptr. 216 (1st Dist. 1962) *with Miree v. United States,* 526 F.2d 679 (5th Cir. 1976); *City of Inglewood v. City of Los Angeles,* 451 F.2d 948 (9th Cir. 1971). Moreover, there is also a question as to whether, if plaintiffs have standing, they have properly exhausted their administrative remedies. *See City of Inglewood v. City of Los Angeles, supra,* 451 F.2d at 956; *Port of New York Authority v. Eastern Air Lines, supra,* 259 F.Supp. at 753. However, even assuming that the merits of plaintiffs' claim are properly before the court, we fail to see how enactment of the Hayward ordinance violates any of the agreements relied on by plaintiffs.

Plaintiffs' claim that the City of Hayward failed to adequately provide for compatible land use around its airport is not well taken. It is apparent from the record that the Hayward ordinance was enacted primarily in response to complaints from residents in nearby San Lorenzo, whose land use Hayward has no ability to control. Moreover, given the competing factors that Hayward had to consider, this court is of the opinion that Hayward has made its airport available for public use on fair and reasonable terms. While there is some evidence to indicate that the ordinance was primarily passed with plaintiffs in mind, this seems to be because it was plaintiffs' planes that were causing most of the noise problems. In any case, it is clear that the ordinance does not unjustly discriminate against the plaintiffs. The only two distinctions which the ordinance makes are that it operates only between the hours of 11:00 p. m. and 7:00 a. m. and that it applies only to airplanes that emit more than 75 dBA of noise in takeoff or landing. The

reasons for the former distinction are obvious. The latter distinction was established only after consultation with an expert in the noise field and is based on that expert's appraisal of maximum permissible noise levels that would not disturb sleep. Both distinctions apply to all plane operators in the same manner.

Thus, plaintiffs have also failed to demonstrate a reasonable likelihood that they will prevail on the merits of this claim and, therefore, this court must, and hereby does, deny their motion for a preliminary injunction.

## II. DEFENDANT'S MOTION TO DISMISS

▮ Defendants move to dismiss this action for lack of subject matter jurisdiction. Plaintiffs argue that jurisdiction is conferred by virtue of 28 U.S.C. §§ 1331, 1337. Plaintiffs' contention with respect to section 1331 would appear to be correct except that plaintiffs have not alleged that the matter in controversy exceeds the sum or value of $10,000.[20] However, in any case, this court is of the opinion that jurisdiction is proper under 28 U.S.C. § 1337. *See Lockheed Air Terminal Inc. v. City of Burbank, supra,* 318 F.Supp. at 915; *Aircraft Owners and Pilots Ass'n v. Port Authority of New York,* 305 F.Supp. 93, 103 (E.D.N.Y.1969). Defendant's argument that the constitutional claims stated by plaintiffs fail at the outset and should be dismissed is best brought before the court by way of motion for summary judgment.

▮ Defendant also moves to dismiss plaintiffs claim for damages. Defendant argues that while plaintiffs' complaint fails to state the basis on which a claim for damages is grounded, it could only have been brought pursuant to 42 U.S.C. § 1983. Thus, defendant asks this court to dismiss such a claim since the City of Hayward is not a "person" within the meaning of that statute. *See e. g., City of Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). Accordingly, to the extent that

---

**20.** Plaintiffs are hereby given leave to amend this omission.

plaintiffs' complaint does seek to recover damages against defendant City of Hayward under 42 U.S.C. § 1983, that claim is hereby dismissed.

 Plaintiffs, however, have amended their complaint to include a claim for inverse condemnation against the city. Plaintiffs' theory is that the enactment of the Hayward Ordinance deprived plaintiffs of access to the runways at the Hayward Air Terminal during certain nighttime hours, thereby substantially decreasing the value of certain long term aviation site leases which plaintiffs had entered into with the city and pursuant to which plaintiffs had constructed certain fixed base facilities.

As we indicated at the oral argument of these motions, this court has serious reservations regarding the validity of this claim. The Hayward ordinance does not regulate any property of the plaintiffs; it only restricts the use of the airport's own runways from noisy aircraft during certain nighttime hours. Moreover, plaintiffs have no absolute right to unrestricted use of the airport's runways at all hours of the day by any type or class of aircraft. Thus, it is highly questionable whether plaintiffs have any right to be compensated for the alleged decrease in value to their leased property when such decrease was caused solely by the defendant's denial of unrestricted access to its airport's runways. *Cf. Colberg v. State of California,* 67 Cal.2d 408, 62 Cal. Rptr. 401, 432 P.2d 3 (1967). Finally, since the ordinance only prevents plaintiffs from using the airport's runways between the hours of 11:00 p. m. and 7:00 a. m., it is clear that plaintiffs' property has not been so substantially deprived of value as to have been unlawfully "taken" within the meaning of the Fourteenth Amendment of the United States Constitution and Article I, § 19 of the California Constitution. *See e. g., South Terminal Corp. v. Environmental Protection Agency,* 504 F.2d 646, 678 (1st Cir. 1974); *HFH Ltd. v. Superior Court,* 15

Cal.3d 508, 125 Cal.Rptr. 365, 542 P.2d 237 (1975).

Accordingly, defendant's motion to dismiss plaintiffs' inverse condemnation claim is hereby granted.[21]

### III. CONCLUSION

To recapitulate, plaintiffs' motion for a preliminary injunction is denied. Defendant's motion to dismiss for lack of subject matter jurisdiction is denied. Defendant's motion to dismiss plaintiffs' claims for damages under 42 U.S.C. § 1983 is granted as is defendant's motion to dismiss plaintiffs' claim for inverse condemnation.

In addition, the parties are directed to appear before this court on Monday, July 19, 1976, at 3:30 p. m., for a status conference. At that time, we would like to hear from the parties regarding the best means of proceeding with this litigation in light of the views expressed by the court in this opinion.

IT IS SO ORDERED.

---

21. This would not, however, preclude plaintiffs from proceeding against the city in the state court for breach of contract or promissory estoppel or any other appropriate theory. We, of course, intimate no views as to the merits, if any, of such claims.