**SAN DIEGO UNIFIED PORT DISTRICT, Plaintiff,**

**Air Transport Association of America et al., Plaintiffs-in-Intervention,**

**v.**

**Adriana GIANTURCO, Director of Transportation of the State of California, Edwin J. McKenney, Chief of the Division of Aeronautics of the Department of Transportation of the State of California, and the Department of Transportation of the State of California, Defendants.**

Civ. No. 78–97–S.

United States District Court, S. D. California.

Aug. 30, 1978.

Michael Scott Gatzke, Luce, Forward, Hamilton & Scripps, San Diego, Cal., for plaintiffs; Ralph W. Dau, O'Melveny & Myers, Los Angeles, Cal., for plaintiffs-in-intervention.

Edward J. Connor, Jr., Dept. of Transportation, Sacramento, Cal., for defendants.

## OPINION

EDWARD J. SCHWARTZ, Chief Judge.

This is an action for declaratory and injunctive relief initially brought by the San Diego Unified Port District ("Port District") against the California Department of Transportation and two of its officers (collectively referred to as "Department"). The focus in the litigation is San Diego International Airport, Lindbergh Field, which is owned and operated by the Port District. The Department seeks to impose an extended curfew at Lindbergh Field which the Port District contends is unconstitutional.

The parties have raised numerous issues which require extended consideration.

## FACTS

### General Background

In 1969 the California Legislature enacted legislation directing the Department of Aeronautics (now the Department of Transportation) to adopt noise standards for airports operating under a state permit. Cal. Pub.Util.Code § 21669 *et seq.* (West Supp. 1978). Pursuant to this statutory authorization, the Department subsequently adopted "noise standards" which now appear at 21 Cal.Admin.Code §§ 5000–5080.5.

The regulations adopted by the Department seek to achieve a gradual reduction in the amount of noise generated by aircraft take-offs and landings at California airports. The regulations establish what is known as a Community Noise Equivalent Level (CNEL). CNEL regulations provide a method for computing on a 24-hour basis an average noise exposure level. A cumulative analysis takes into account the total noise generated by aircraft "events" over a given period of time. The regulations require that, in graduated steps, no airport is to have a "noise impact boundary" containing "incompatible land use" in excess of 65 dB on the CNEL scale by 1985.

The CNEL regulations require an airport operator to operate its airport so as not to exceed the applicable CNEL noise level. Cal.Admin.Code § 5062. An operator unable to comply with the Noise Standards may apply to the Department for a variance. Cal.Admin.Code § 5075. As a practical matter, the Noise Standards are so stringent that each of the major airports in California, including Lindbergh Field, apparently must apply for a variance as a matter of routine.

### Lindbergh Field's Variance Applications

The Port District, as proprietor of Lindbergh Field, filed its first application for a variance from the Noise Standards on January 24, 1975. Hearings were held before an administrative law judge on September 2–4, 1975. While this application was pending,

on December 2, 1975, the Port District's Board of Port Commissioners adopted a resolution which imposed a curfew on most jet landings and take-offs between the hours of 12:00 midnight and 6:00 a. m. A proposed decision on the variance application by the administrative law judge was adopted by the Department of Transportation on January 19, 1976. The variance was granted for a period of one year subject to certain restrictions, one of which was the following:

2. Respondent San Diego Unified Port District shall diligently pursue every avenue to ensure that aircraft which fail to meet the FAR 36 requirements do not use the field for take-offs or landings during the hours from 11:00 p. m. until 7:00 a. m. each day. In this connection respondent will negotiate with the respective airlines in an effort to refrain scheduling nighttime flights. In all future contracts with air carriers, respondent shall require that aircraft not meeting the FAR 36 standards will not be used during the 11:00 p. m. to 7:00 a. m. hours. Respondent shall use its best efforts in urging the FAA to adopt a policy consistent with the restriction of nighttime flights which do not meet the FAR 36 standards. . . .

The Port District's second variance application was filed on January 14, 1977. Once again, an administrative law judge conducted hearings on this application. His proposed variance decision was adopted by the Department of Transportation on January 17, 1978.

This variance, like its predecessor, was granted subject to certain restrictions and conditions. The key condition, now challenged in this court, provides in pertinent part as follows:

4. Respondent San Diego Unified Port District is to retain the existing curfew which currently prohibits take-offs and landings by commercial air carriers between the hours of 12 midnight and 6:00 a. m. Respondent is to extend this existing curfew to the extent that commercial air carriers will not be permitted to take off between the hours of 11:00 p. m. and 7:00 a. m. and commercial air carriers will not be permitted to land between the hours of 11:00 p. m. and 7:00 a. m. unless such aircraft meet FAR part 36 requirements. . . .

*Procedural Posture of this Litigation*

Following the granting of the second variance, the Port District brought this action to have Condition 4—the "curfew condition"—declared unconstitutional. On March 13, 1978, the court heard argument on the Port District's motion for a preliminary injunction. The court denied the motion without prejudice, ruling that the Port District should first apply to the Federal Aviation Administration (FAA) for a determination as to whether the curfew extension would be unjustly discriminatory or detrimental to the National Air Transportation System.[1]

Immediately thereafter, the Port District followed the court's directive and applied to FAA for review of the curfew extension. Full background information was provided to FAA by both the Port District and the Department to facilitate review. In addition, FAA solicited and received information from various interested parties, including the Air Transport Association of America. On July 20, 1978, FAA advised both the Port District and the Department that it had completed its review of the matter.

---

1. The court ruled that because of a provision contained in Condition 4, the Port District had not exhausted its administrative remedies. The provision referred to provides as follows:

The curfew shall be extended as described within 120 days of the effective date of this order unless respondent [Port District] secures from the Federal Aviation Administration a written determination with supporting factual findings that the Federal Aviation Administration has determined the proposed

curfew extension to be unjustly discriminatory or detrimental to the National Air Transportation System. Respondent shall submit its request to the Federal Aviation Administration for review within sixty days of the effective date of this order and such request shall contain all of the information required by the Aviation Noise Abatement Policy of November 18, 1976. The Department of Transportation for good cause shown may grant an extension of the above time periods.

FAA indicated it would not provide any response and that no written statement concerning its review would be forthcoming.

Having exhausted its administrative remedies, the Port District looked again to this court for relief. In the face of threats by the Department that it would terminate the noise variance unless the Port District complied with Condition 4 and extended the Lindbergh Field curfew, the Port District applied for a temporary restraining order on July 28, 1978. The court granted the Port District's application.

On August 21, 1978, the court granted leave to the Air Transport Association of America and various commercial airline companies to intervene as plaintiffs in the litigation. The court then heard argument on motions by the Port District and intervenors for a preliminary injunction and the Department's motion for summary judgment. We now turn to a discussion of these motions.

## PRELIMINARY INJUNCTION

■ In this circuit, a party seeking a preliminary injunction must satisfy one of two alternate tests to establish his entitlement to such relief. The first test requires a showing of probable success on the merits combined with the possibility of irreparable injury. The second test requires the applicant to demonstrate that serious questions are raised and that the balance of hardships tips sharply in his favor. *Wm. Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 526 F.2d 86, 88 (9th Cir. 1975). In this case, the Port District and intervenors are entitled to a preliminary injunction under either test.

### A. *First Test*

#### 1. *Irreparable Injury*

■ As noted above, Condition 4 of the variance requires the Port District to lengthen the curfew now in effect from six to eight hours. The Port District and intervenors have established to the court's satisfaction that they will be irreparably injured if they are required to comply with this condition while the litigation is pending.

The likelihood of irreparable injury can best be understood by highlighting the problems and conflicting demands faced by Lindbergh Field. The airport is located in a central area of San Diego, only minutes from the downtown business district, hotels and motels, and tourist attractions. While the airport is most convenient in terms of its location, this convenience carries a high price. Lindbergh Field is surrounded by heavily populated residential areas. The noise generated by aircraft activity at Lindbergh Field has been, for many years, a source of great annoyance to nearby residents. Frequently, the airport and airlines which use the airport have found themselves defending noise-related lawsuits brought by these residents. Pressure often has been exerted on the Port District by various organizations to do something about the airport noise problem.

At the other end of the spectrum is a substantial segment of the community which believes air service in and out of San Diego should be developed more fully. These people have pressed the airport to increase its level of service so that San Diego can become a national center of tourism and commerce. They have argued, often successfully, that the San Diego community needs a high level of air service to maintain a strong economy.

To satisfy these conflicting demands, the Port District has chosen a middle course. By instituting a 12:00 midnight to 6:00 a.m. curfew on most jet take-offs and landings, the Port District has attempted to reduce the total amount of noise generated by airport operations. This curfew was instituted over the objection and threatened non-compliance of the airlines which use the airport. With this voluntary curfew, the Port District has achieved a delicate balance between the concerns of airport-area residents, the needs of the San Diego community as a whole, and the requirements of the airlines. It is doubtful that this balance between competing interests could be maintained if the Port District were forced to

adopt the longer curfew advocated by the Department.

Irreparable harm is further evidenced by the fact that the Department has threatened to revoke the noise variance because the Port District has not complied with Condition 4. After FAA notified the parties that it would provide no response concerning its review of the curfew, the Department informed the Port District that proceedings to revoke the noise variance would be initiated unless the Port District's Board of Port Commissioners immediately adopted an extended curfew. It was for this reason that the Port District was granted a temporary restraining order by the court. If a preliminary injunction is denied, the Department will again be in a position to revoke the noise variance for the Port District's failure to comply with Condition 4.

There are additional ways in which the Port District and intervenors will be irreparably harmed if a preliminary injunction does not issue. Affidavits filed with the court by airport and airline personnel demonstrate that an extended curfew will require the airport to cut back the quantity and quality of air service provided to the community. Moreover, the airlines will be forced to adjust their flight schedules and cancel some flights altogether. The effects of such action will be felt not only in San Diego, but in other cities across the nation where connecting flights will be disrupted. The inevitable result will be increased costs, decreased revenues, and loss of goodwill.

As a final point on the question of irreparable harm, the court believes that the Port District and intervenors ultimately will succeed on the merits of this case. If the Port District is denied a preliminary injunction, but eventually prevails on the merits in its challenge to the curfew condition, the Port District will have no choice but to extend its curfew during the pendency of the litigation. Requiring the Port District to extend its curfew for such a limited time would magnify the various problems noted above. Such a result would be unfair and unreasonable.

In sum, it appears that the kind of harm the Port District and intervenors will sustain in the absence of a preliminary injunction is not readily translatable into dollar amounts. Therefore, the Port District and intervenors have demonstrated the required showing of irreparable harm.

### 2. The Merits

The principal basis for this action is the Port District's contention that Condition 4 of the noise variance is unconstitutional because it invades a field preempted by federal law. Before we can reach this constitutional argument, certain jurisdictional and procedural points raised by the Department must be addressed.

### a. Eleventh Amendment

The first objection to the court's jurisdiction is raised by the Department's contention that this is a suit against a state which is barred by the Eleventh Amendment.

The Eleventh Amendment generally "acts as a jurisdictional bar to suits brought against state governments in the federal courts." J. Nowak, R. Rotunda, & J. Young, *Handbook on Constitutional Law* 48 (1978). The Supreme Court has held that the Amendment protects a state from federal court suits by its own citizens as well as by citizens of other states. *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); see *Parden v. Terminal R. Co.*, 377 U.S. 184, 186, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). Despite the general immunity conferred by the Eleventh Amendment, however, its protective shield is not absolute. Based on the landmark decision of the Supreme Court in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the federal courts have preserved for themselves the power "to enjoin state officials to conform their conduct to the requirements of federal law." *Milliken v. Bradley*, 433 U.S. 267, 289, 97 S.Ct. 2749, 2762, 53 L.Ed.2d 745 (1977). Thus, the Eleventh Amendment poses no bar to prospective injunctive relief against unconstitutional state action. *Milliken v. Bradley, supra; Edelman v. Jordan,*

415 U.S. 651, 668, 677, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

Although the Department acknowledges the rule of *Ex parte Young*, it suggests that *Ex parte Young* has no application here. It contends that the Port District and intervenors enjoy no constitutional right which is being invaded by Condition 4. This argument cannot stand in light of the Supreme Court's recent decision in *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978). In *Ray*, two companies involved in the refinement and transportation of oil challenged the constitutionality of a Washington state law which regulated the design, size and movement of oil tankers in Puget Sound. Plaintiffs contended that the Washington law violated the Supremacy Clause, Art. VI, cl. 2, of the Constitution. In a footnote, the Supreme Court rejected the state defendants' claim of immunity under the Eleventh Amendment:

> The state defendants challenged the District Court's jurisdiction over them, asserting sovereign immunity under the Eleventh Amendment. They recognized that in *Ex parte Young*, 209 U.S. 123 [28 S.Ct. 441, 52 L.Ed. 714] (1908), the Court held that the Eleventh Amendment does not bar suit in federal court against a state official for the purpose of obtaining an injunction against his enforcement of a state law alleged to be unconstitutional, but urged the District Court to overrule that decision or to restrict its application. The District Court declined to do so. The request is repeated here, and we reject it.

*Ray v. Atlantic Richfield Co.*, *supra*, 435 U.S. at 156 n.6, 98 S.Ct. at 994.

█ Based on this statement in *Ray*, it is apparent that the Eleventh Amendment will not bar a federal court suit for injunctive relief against state officers whose action is alleged to be unconstitutional by virtue of the Supremacy Clause. The Port District and intervenors here stand in precisely the same position as the plaintiffs in *Ray*. Further, the fact that the Port District and intervenors are not challenging the constitutionality of the noise standards legislation itself but are attacking the constitutionality of action taken by the Department pursuant to the legislation makes no difference as far as the Eleventh Amendment is concerned. There is no authority for the position advanced by the Department that the underlying legislation itself must be challenged before the rule of *Ex parte Young* comes into play. *See Greene v. Louisville & Interurban R. Co.*, 244 U.S. 499, 507, 37 S.Ct. 673, 61 L.Ed. 1280 (1917); *Reagan v. Farmers' Loan & Trust Co.*, 154 U.S. 362, 390, 14 S.Ct. 1047, 38 L.Ed. 1014 (1894).

b. *Port District's Legal Capacity to Sue the Department*

As a second objection to the court's jurisdiction, the Department urges that the Port District lacks the legal capacity to maintain this action. In the Department's view, the Port District is a political subdivision of the State which has no authority to challenge regulatory actions taken by another agency pursuant to state legislation. This argument can be placed under any one of three headings: lack of a case or controversy, lack of a substantial federal question, or lack of standing.

The basis for this argument is the Supreme Court's holding in *Williams v. Mayor of Baltimore*, 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015 (1933):

> A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator.

Citing the *Williams* decision, Professors Wright, Miller and Cooper have made the following observation concerning the constitutional rights of political subdivisions:

> Political subdivisions of states have been held to lack constitutional rights against the creating state, a conclusion that is at times translated into a lack of standing to challenge state policies.

13 C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3531, at 234 (1975).

The Department's contention that the Port District's status as a political subdivision bars this suit is unpersuasive. First, even if the Department is correct that a political subdivision cannot maintain the instant type of action, the intervenors are private parties which clearly can maintain such a suit. As a practical matter, dismissing the Port District would not affect the vitality of the suit because the intervenors would continue to press their similar constitutional claims.

■ More important, it has not been persuasively demonstrated that a political subdivision cannot maintain a constitutional challenge to state action based on the Supremacy Clause. The authority relied upon by the Department establishes beyond doubt that the protections afforded by the Fourteenth Amendment and the Contract Clause do not extend to political subdivisions. *E. g., City of Trenton v. State of New Jersey*, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923); *City of Newark v. State of New Jersey*, 262 U.S. 192, 43 S.Ct. 539, 67 L.Ed. 943 (1923); *Williams v. Mayor of Baltimore, supra.* Thus, a political subdivision cannot bring suit against a state based on the Fourteenth Amendment or the Contract Clause. The Department cites no authority for the proposition that an action brought by a political subdivision against a state based on the Supremacy Clause is similarly barred. The Port District, on the other hand, cites a number of cases in which political subdivisions have been permitted to maintain Supremacy Clause challenges to state action. *Triplett v. Tiemann*, 302 F.Supp. 1239 (D.Neb.1969); *Carlsbad Union School District of San Diego County v. Rafferty*, 300 F.Supp. 434 (S.D.Cal.1969); *Douglas Independent School District No. 3 v. Jorgenson*, 293 F.Supp. 849 (D.S.D.1968); *Hergenreter v. Hayden*, 295 F.Supp. 251 (D.Kan.1968).

■ The reason for distinguishing between constitutional challenges based on the Supremacy Clause and challenges based on other constitutional provisions lies in the purpose of the Supremacy Clause. The Supremacy Clause mandates that "This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land." U.S.Const., Art. VI, cl. 2. This provision forbids state regulation which conflicts with federal law. It establishes a structure of government which defines the relative powers of states and the federal government. The Supremacy Clause does not confer a "right" on any individual, but it does impose a general limitation on state power.

Other constitutional provisions, unlike the Supremacy Clause, do confer fundamental rights on individual citizens. The Fourteenth Amendment, for example, guarantees that all citizens enjoy equal protection of the laws and due process of law. These are not structural limitations on government power in the Supremacy Clause sense, but they are rights given to individual citizens which limit governmental power generally. Such rights accrue to individual citizens, not to units of government. Consequently, political subdivisions have no legitimate basis for asserting constitutional rights which are intended to limit governmental action vis-a-vis individual citizens.

If the Supremacy Clause is to be effective in achieving its purpose, its dictates must be enforceable by political subdivisions of states as well as by individuals. Political subdivisions can be profoundly affected by state action which conflicts with federal law. If political subdivisions were prevented from challenging preempted state legislation and regulation, such legislation and regulation often would go unchecked even though expressly prohibited by the Constitution. It makes no sense to prevent subdivisions of state government from acting to ensure state compliance with the commands of a constitutional provision that establishes the basic federal system of our government.

### c. *Preemption*

We turn now to the crucial issue in the case: Is Condition 4 of the state noise variance unconstitutional because it invades a field preempted by federal law?

The Port District and intervenors rely on *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), to support their contention of preemption. In *Burbank*, the proprietor of the Hollywood-Burbank Airport sought an injunction against a Burbank city ordinance which imposed an 11:00 p. m. to 7:00 a. m. curfew on take-offs by jet aircraft. The ordinance made it unlawful for jet aircraft to take off from the airport during the curfew and for the operator of the airport to allow such aircraft to take off from the airport during the curfew. The Supreme Court held that the Federal Aviation Act of 1958, 49 U.S.C. § 1301 *et seq.*, as amended by the Noise Control Act of 1972, 42 U.S.C. § 4901 *et seq.*, establishes a pervasive scheme of federal regulation of aircraft noise, preempting state and local control. As a result, the Burbank city ordinance was declared unconstitutional under the Supremacy Clause.

To reach this conclusion, the *Burbank* Court carefully analyzed the structure and legislative history of the Federal Aviation Act of 1958 and the Noise Control Act of 1972. The Court found the detailed and comprehensive nature of the legislation constituted a "comprehensive scheme of federal control of the aircraft noise problem." 411 U.S. at 629, 93 S.Ct. at 1857. Especially persuasive were statements contained in committee reports and statements made during floor debates on the 1972 Act. Writing for the Court, Mr. Justice Douglas summed up the import of the 1958 and 1972 statutes as follows:

> Control of noise is of course deep-seated in the police power of the States. Yet the pervasive control vested in EPA and in FAA under the 1972 Act seems to us to leave no room for local curfews or other local controls. . . . The interdependence of these factors requires a uniform and exclusive system of federal regulation if the congressional objectives underlying the Federal Aviation Act are to be fulfilled.

411 U.S. at 638–39, 93 S.Ct. at 1862. Finally, the Court's opinion makes this telling observation:

> We are not at liberty to diffuse the powers given by Congress to FAA and EPA by letting the States or municipalities in on the planning. If that change is to be made, Congress alone must do it.

411 U.S. at 640, 93 S.Ct. at 1863.

■ To avoid the *Burbank* decision, the Department suggests that the situation presented by the instant case falls within the "proprietary" exception to *Burbank*. The courts recognize that an airport proprietor may restrict the use of its facilities on the basis of noise considerations without running afoul of the preemption doctrine. *British Airways Bd. v. Port Authority of New York*, 558 F.2d 75 (2d Cir. 1977); *National Aviation v. City of Hayward*, 418 F.Supp. 417 (N.D.Cal.1976). The role of airport proprietors in developing noise abatement programs has been endorsed by the FAA, *see* Dept. of Transportation, Aviation Noise Abatement Policy 34 (Nov. 18, 1976), and the Supreme Court has declined to hold that Congress has preempted the field of noise regulation to the exclusion of airport proprietors. *City of Burbank v. Lockheed Air Terminal Inc., supra*, 411 U.S. at 635 n.14, 93 S.Ct. 1854. Thus, an airport proprietor remains free to impose curfews on aircraft activity at its airport. *National Aviation v. City of Hayward, supra*. Courts have permitted proprietors this regulatory leeway because the proprietor is liable for compensable takings due to noise from overflying commercial aircraft. *Griggs v. Allegheny County*, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). Consequently, it has been assumed that "the operator will act in a rational manner in weighing the commercial benefits of proposed service against its costs, both economic and political." *British Airways Bd. v. Port Authority of New York, supra*, 558 F.2d at 83.

■ The Department would have the court believe this case involves nothing more than an airport proprietor adopting an extended curfew. The Department denies it has "directed" the Port District to impose a curfew as was true in *Burbank*, but suggests rather that it has merely "condi-

tioned" the granting of a noise variance upon compliance with a curfew condition. The Department sees this as a case where the decision whether to impose a longer curfew will be made by the Port District, not by the Department.

The difficulty with this portrayal is that it ignores the practical effect of the Department's action. Looking at the matter realistically, the Port District does not have any alternative to complying with Condition 4. The CNEL regulations promulgated by the Department require compliance with the applicable CNEL noise level. Cal.Admin. Code § 5062. An airport operator unable to achieve compliance must apply to the Department for a variance. Cal.Admin.Code § 5975. There does not seem to be any doubt, given Lindbergh Field's location and the present state of aircraft technology, that it is physically impossible for Lindbergh Field to comply with applicable CNEL noise standards. Indeed, the administrative law judge who conducted hearings on the Port District's most recent variance application noted:

> Actually, Lindbergh Field will continue to have an extremely serious noise problem for a long period of time. There are no realistic solutions presently available to bring Lindbergh Field into compliance with the State Noise Standards. Operational techniques have and will produce only minimal noise reduction. . . .
> Even if all commercial aircraft were in compliance with the FAR 36 requirements Lindbergh Field would yet be far short of the State noise objectives. . .
> It is quite obvious that the noise problem is not subject to any instant solution.

Proposed Decision, In the Matter of the Statement of Issues Regarding the Application of Port of San Diego 5–6 (Dec. 9, 1977). In other words, if the Port District is to comply with state law and avoid criminal penalties, it has no choice but to seek a noise variance from the Department. Similarly, the Port District is in no position to avoid whatever conditions are attached to a variance. It must go along with what the Department wants it to do—in this case, extension of the existing curfew. In practical effect, the decision to impose an extended curfew is being dictated to the Port District by the Department. This is precisely the type of non-proprietary airport regulation which the Supreme Court disallowed in *Burbank*.

In *Burbank*, Mr. Justice Douglas cautioned against the states or municipalities being permitted to interfere with the need for uniform and exclusive federal regulation over aircraft noise:

> If we were to uphold the Burbank ordinance and a significant number of municipalities followed suit, it is obvious that fractionalized control of the timing of take-offs and landings would severely limit the flexibility of FAA in controlling air traffic flow. The difficulties of scheduling flights to avoid congestion and the concomitant decrease in safety would be compounded.

*City of Burbank v. Lockheed Air Terminal, Inc., supra,* 411 U.S. at 639, 93 S.Ct. at 1862. This same concern must be raised again here. What the Department seeks to do here, if other states and localities do likewise, would pose very serious problems to the national network of air transportation. There is the further concern that if the Department can successfully force implementation or extension of a curfew by use of a condition attached to a variance, the door will be opened to policymakers and departments at all levels of state and local government to take a similar approach whenever they wish to control airport activity. Local and state governments should not be permitted to use variances, licenses, and permits to achieve indirectly what the Supreme Court has interdicted them from doing directly.

One additional point raised by the Department in connection with the preemption question should be mentioned. The Department asserts that a condition to a variance cannot be challenged as unconstitutional unless it can be demonstrated that the plaintiff has some constitutional right to the variance itself. Since the Department has issued a variance to the Port District, it

is unnecessary to decide whether the Port District has a constitutional right to a variance. Even assuming that the Port District is not constitutionally entitled to a variance, this does not mean that the Department can attach unconstitutional conditions to a variance that is issued. No suggestion is made, as the Department seems to believe, that federal rules of preemption can operate so as to require the granting of a variance. What is required is that once the Department decides to issue a variance, all provisions of the variance must comport with constitutional requirements.

### d. *Relationship of the Port District to the Department*

The Department advances two final arguments in support of its position that the Port District and intervenors cannot succeed on the merits in this case. Both arguments rest on the Department's view of the Port District's relationship to the State of California and the obligations the Department perceives the Port District as having by virtue of that relationship.

### (1) *The "Control" Theory*

The first argument can be labelled as the "control" theory. It is the Department's contention that the Port District is a subordinate governmental entity which can be directed by its creator to exercise its proprietary powers to abate noise. This contention emanates from a footnote in *Air Transport Association v. Crotti*, 389 F.Supp. 58 (N.D.Cal.1975) (three-judge court), in which the court observed, "The power of the State to generally regulate its political subordinates, including local airport authorities, is well established as a matter of law." 389 F.Supp. at 64 n.2.

■■■ As a general proposition, the court agrees that the Port District cannot conduct its affairs in a manner contrary to state law or contrary to regulatory actions properly taken pursuant to state law. This proposition applies not just to the Port District, but to all citizens and entities in the state. What must be emphasized is that regulatory actions, to be valid and enforce-

able, must be constitutional. Actions taken pursuant to state law do not escape constitutional scrutiny simply because the state has regulatory or police power.

■■■ The Port District stands before the court as a distinct governmental entity created by the state legislature. It was created in 1962 by the San Diego Unified Port District Act. Cal.Harb. & Nav.Code, App. 1, § 1 *et seq.* (West 1978). The Port District was granted numerous powers and responsibilities under this legislation. Particularly significant to this case are a number of statutory provisions which established the authority of the Port District to own and operate Lindbergh Field. Section 14 of the Act required the City of San Diego to convey to the Port District all right, title, and interest in and to tidelands and submerged lands in San Diego Bay which were owned by the City. Cal.Harb. & Nav.Code, App. 1, § 14 (West 1978). The airport was located on such land; thus it was conveyed to the Port District. *See id.* §§ 68 & 70. Section 5 of the Act provides in pertinent part as follows:

> The jurisdiction of the district to exercise its powers shall extend only over the following areas:
>
> (a) The tidelands and submerged lands granted to the district pursuant to the provisions of this act.
>
> (b) Any airport or airports now or hereafter owned and operated by any of the above-named cities which establish the district, or San Diego County, and which are conveyed to the district by such city or cities or San Diego County.

*Id.* § 5. Other relevant powers granted to the Port District include the right to sue and be sued, the right to hold, enjoy, lease, and dispose of property, and the right to take all necessary action to exercise its powers. *Id.* §§ 23, 25, & 35.

There can be no doubt in light of this statutory scheme that the legislature intended the Port District to own, manage, and operate Lindbergh Field. There is no evidence that the legislature intended the Department or any other agency of state

government to control the manner in which the Port District exercises its statutory powers. In fact, there is explicit statutory evidence to the contrary. In outlining the powers and duties of the Department, Public Utilities Code § 21632 provides as follows:

> The department may also acquire existing airports and air navigation facilities but it shall not acquire any airport or air navigation facility owned or controlled by a political subdivision of this or any other state without the consent of the political subdivision.

Since the legislature has carefully drafted a statutory scheme which confers on the Port District exclusive powers of ownership and control of Lindbergh Field, the Department cannot avoid application of the preemption doctrine by relying on the fact that the Port District is a political subdivision of the State. A non-proprietor such as the Department should not be permitted to assume powers which are given solely to the Port District and thus avoid the rule of preemption announced in *Burbank*.

### (2) The "Constructive Proprietor" Theory

■ The Department's second argument can be termed the "constructive proprietor" theory. In the Department's eyes, the airport is located on state tidelands which the Department contends the Port District holds in trust for the State. As a result, the Department believes it can exercise proprietary authority over airport operations.

This case does not present a situation where the State, through legislation, has attempted to become the owner and operator of Lindbergh Field. What the legislature has done is cast the Port District—not the Department—in the role of owner and operator. That the land on which Lindbergh Field is located may be State land, as the Department contends, cannot change the fact that the Port District is the only entity, under the Port District Act and Public Utilities Code, which has proprietary authority over the airport. The Port District's role as proprietor is reinforced by the Airport Operating Certificate issued in 1973 by FAA, which certifies "The San Diego Unified Port District . . . as owner and operator of San Diego International—Lindbergh Field." Consequently, the Department's suggestion that it can exercise proprietary authority over the airport cannot be accepted.

### 3. Conclusion

For the foregoing reasons, the court believes the Port District and intervenors are likely to succeed on the merits in this case. Since the Port District and intervenors have demonstrated irreparable injury combined with probable success on the merits, they are entitled to a preliminary injunction under the first test in effect in this circuit.

### B. Second Test

■ We now examine whether the Port District and intervenors are entitled to a preliminary injunction under the second test in effect in this circuit.

### 1. Serious Questions

As indicated above, a non-proprietor of an airport is preempted by federal law from requiring a proprietor to adopt a curfew on aircraft landings and take-offs. On the basis of the factual record presently before the court, it appears that Condition 4 represents an attempt by the Department, a non-proprietor, to force the Port District to adopt an extended curfew at Lindbergh Field. Since the court believes Condition 4 is unconstitutional, this case does indeed raise very serious questions.

### 2. Balance of Hardships

The court also believes the balance of hardships tips sharply in favor of the Port District and the intervenors. A longer curfew will disrupt or destroy the delicate balance which now exists between the concerns of the airport-area residents, the needs of the San Diego community as a whole, and the requirements of the airlines. A longer curfew will require readjustment of schedules by the airport and airlines, increased expenditures by the airlines, can-

cellation of flights in and out of San Diego, and a resulting deterioration of airline service. These hardships loom particularly serious in light of the fact that Condition 4 probably will be declared unconstitutional by the court.

The Department, on the other hand, will suffer no appreciable hardship if a preliminary injunction issues. The only interest the Department can point to that would be at all harmed is its desire that the Port District comply with Condition 4 and adopt an extended curfew. This desire for compliance is relatively insubstantial when compared to the hardships an extended curfew will impose on the Port District and intervenors. Moreover, even though the Port District has not adopted an extended 11:00 p. m. to 7:00 a. m. curfew as required by Condition 4, a 12:00 midnight to 6:00 a. m. curfew, voluntarily adopted by the Port District, does remain in effect.

One final observation is pertinent to the question of relative hardships. In opposing the motion for a preliminary injunction, the Department has emphasized that enjoining Condition 4 will entail great social costs in the form of aircraft noise affecting airport-area residents. These residents are not parties to the litigation, however. The Department does not represent only those people who live in the vicinity of Lindbergh Field. It represents *all* residents of the state, including those who may prefer that Lindbergh Field have no curfew. While the court is sympathetic to the great annoyance visited upon airport-area residents by jet aircraft noise, it is not possible in this litigation for the court to pass judgment on the noise problem at Lindbergh Field or the advantages and disadvantages of a curfew. The only issue in this case is the constitutionality of Condition 4, and the only parties before the court are the Port District, the airlines, and the Department.

3. *Conclusion*

In sum, the Port District and intervenors have demonstrated that serious questions are raised and that the balance of hardships tips sharply in their favor. Thus, the Port

District and intervenors have established their entitlement to a preliminary injunction under both tests applicable in the Ninth Circuit.

The court will issue a preliminary injunction enjoining the Department of Transportation, its officers, and employees from taking any action to terminate the noise variance on the ground that the Port District has not complied with Condition 4.

This opinion shall constitute the court's findings of fact and conclusions of law as required by Rule 52(a), Federal Rules of Civil Procedure.

*SUMMARY JUDGMENT*

The Department moves for summary judgment under Rule 56, Federal Rules of Civil Procedure. Rule 56(c) permits the entry of a summary judgment upon a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." It appears from the substantial record of affidavits and exhibits before the court that there is no genuine issue as to any material fact. The Department's motion cannot be granted, however, because the Department is not entitled to judgment as a matter of law. As discussed in connection with the analysis of the motions for preliminary injunction, the Port District and intervenors have demonstrated probable success on the merits. Consequently, the Department's motion for summary judgment will be denied.