SAN DIEGO UNIFIED PORT DISTRICT, Plaintiff-Appellee,

and

Air Transport Association of America, et al., Intervening Plaintiffs-Appellees,

v.

Adriana GIANTURCO, et al., Defendants-Appellants.

No. 78–3260.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 2, 1979.

Submission Vacated June 5, 1981.

Resubmitted June 11, 1981.

Decided July 30, 1981.

Rehearing and Rehearing En Banc Denied Sept. 21, 1981.

---

Edward J. Connor, Jr., Atty., Dept. of
Transportation (argued), San Diego, Cal.,

Richard G. Rypinski, Chief Counsel, John B. Matheny, Asst. Chief Counsel, Mark F. Mispagel, Suzanne Jacobs, Susan K. Johann, Attys., Sacramento, Cal. (on brief), for defendants-appellants.

Michael Scott Gatzke (argued), Louis E. Goebel, Gregory T. Smith, Luce, Forward, Hamilton & Scripps (on brief), San Diego, Cal. (on brief), for plaintiff-appellee.

Peter R. Steenland, Jr., Atty., Dept. of Justice (argued), James W. Moorman, Asst. Atty. Gen., Dirk D. Snel, Atty., Washington, D. C. (on brief), for amicus curiae.

Before WRIGHT [*] and TANG, Circuit Judges, and CURTIS,[**] Senior District Judge.

PER CURIAM:

We must determine whether the doctrine of federal preemption prevents the State of California from directing a political subdivision to impose a curfew on aircraft flights. In making our determination, we interpret the Supreme Court's decision in *City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), and later federal statutes. We affirm the district court which concluded that the state could not impose these curfew regulations.

The political subdivision which asserts the invalidity of the state's attempted imposi-

tion of a curfew is the San Diego Unified Port District. The Port District owns and operates San Diego International Airport, Lindbergh Field. Lindbergh Field is the principal airport serving San Diego, and is near the downtown area. Five million passengers pass through the airport each year. This volume of traffic requires frequent jet flights, which produce jet noise that has vexed local residents for some years.

The Port District has attempted to accommodate the needs of commerce and the quiet of San Diego residential areas, by, among other things, unilaterally imposing a midnight to 6:00 a. m. curfew on all commercial jet takeoffs. In addition, the curfew allows only jets meeting strict noise standards to land during those hours.

In spite of these efforts, the State of California, through its Department of Transportation [CalTrans], has attempted to impose a more restrictive curfew through regulations authorized by state statute. *See* Cal.Pub.Util.Code § 21669 (West Supp. 1981).

These would require the measurement of noise at all affected airports and forbid operation of those airports which exceed a preset noise level. *See* 21 Cal.Admin.Code § 5000–5080.5 (1977).[1] Airports which routinely exceed this level cannot operate without a variance issued under procedures established by the regulations. *Id.* § 5062.[2]

Lindbergh Field is in this category, and in January of 1977 the Port District applied

---

[*] This appeal was argued before a panel of Circuit Judges Kennedy and Tang, and District Judge Curtis. Judge Kennedy has recused himself and Judge Wright has replaced him.

[**] Of the Central District of California.

1. These regulations provide both substantive provisions setting the level of permissible noise, 21 Cal.Admin.Code §§ 5001–5014 (1977), as well as a procedural mechanism for the enforcement of those levels, *id.* §§ 5020–5080.5.

The regulations seek to measure ambient aviation noise under the Community Noise Equivalent Level Standard [CNEL]. *Id.* § 5006(f) (1977). CNEL represents a scientific effort to quantify an average person's daily dosage of noise, but by no means is the only available

standard. *See* 41 Fed.Reg. 51,522, 51,524 (1976).

2. The district court found that most major California airports must routinely apply for a variance. 457 F.Supp. at 285. Under CalTrans' regulations, a variance is required unless the airport's "noise impact area" is zero. 21 Cal. Admin.Code § 5062 (1977). In Lindbergh Field's case it was determined that the noise impact area was approximately three-quarters of a square mile, requiring the Port District to apply for a variance. While the regulations allow the attachment of "reasonable conditions" to the grant of a variance, *id.* § 5075(b)(7), the state administrative law judge explicitly found that "[t]here are no realistic solutions presently available to bring Lindbergh

for a variance permit pursuant to CalTrans' regulations.[3] A state administrative law judge granted the permit, subject to six conditions. The fourth condition lies at the heart of this lawsuit and provides:

> Respondent San Diego Unified Port District is to retain the existing curfew .... Respondent is to extend this existing curfew to the extent that commercial air carriers will not be permitted to take off between the hours of 11:00 p. m. and 7:00 a. m. and commercial air carriers will not be permitted to land between the hours of 11:00 p. m. and 7:00 a. m. unless such aircraft meet FAR Part 36 requirements ....

Not willing to extend its curfew another two hours, the Port District sought to enjoin enforcement of the condition. It has contended that federal control of both airspace management and the sources of aircraft noise preempts CalTrans' ability to place such a condition on the variance.

---

Field into compliance with the State Noise Standards."

3. An earlier variance was granted after hearings in 1975–76. Clerk's Record at 1142–51.

4. The court below initially denied the injunction without prejudice until the Federal Aviation Administration had reviewed the proposed curfew, pursuant to the state administrative law judge's order. 457 F.Supp. at 286. Four months later the FAA responded by telephone and indicated that it would not become involved in the matter. *Id.* at 287. The court then· proceeded to consider the injunction on the merits.

5. The Air Transportation Association of America [ATAA] intervened as of right. Fed.R.Civ.P. 24(a)(2). Its complaint alleges that, in addition to being preempted, the proposed curfew violates the commerce clause. Since this case may be disposed of by preemption, we do not reach the commerce clause issues.

6. The United States has adopted a somewhat peculiar position. It urges neither affirmance nor reversal but states that, in its opinion, this case turns on questions of state law, and it would be inappropriate for it to take a position. The United States does urge, however, that we definitively name the proprietor of Lindbergh Field, at least for purposes of the federal government's certification program. *See note* 32 *infra.*

After an initial procedural phase,[4] including the intervention of the Air Transportation Association of America,[5] the district court rendered its decision. 457 F.Supp. 283 (S.D.Cal.1978).

Relying primarily on *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), the court adopted the Port District's position on preemption and issued a preliminary injunction. CalTrans has appealed. The state and several cities have joined it as amici curiae. In addition, the United States[6] and several states have filed briefs amici curiae.

## I. Preemption and the Underlying Federal Policy

■ The Port District's attack on condition four rests primarily on the ground that federal law preempts state regulation of airspace management and control of the source of aircraft noise.[7] This preemption, it is claimed, renders CalTrans powerless to

---

7. In the court below, CalTrans also claimed immunity under the Eleventh Amendment and asserted that the Port District lacked standing. It has abandoned these claims. While a state may waive immunity under the Eleventh Amendment, *Mills Music, Inc. v. Arizona*, 591 F.2d 1278, 1283 (9th Cir. 1979), it may not also waive the issue of standing. *See Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975); *City of South Lake Tahoe v. California Tahoe Regional Planning Agency*, 625 F.2d 231, 233 (9th Cir.), *cert. denied*, 449 U.S. 1039, 101 S.Ct. 619, 66 L.Ed. 2d 502 (1980). We must independently inquire into the parties' standing.

While there are broad dicta that a political subdivision may never sue its maker on constitutional grounds, *see id.*, 625 F.2d at 233–34, we doubt that the rule is so broad. *See City of South Lake Tahoe v. California Tahoe Regional Planning Agency*, 449 U.S. 1039, 101 S.Ct. 619, 66 L.Ed.2d 502 (1980) (White & Marshall, JJ., dissenting from denial of certiorari) ("Such a per se rule is inconsistent with [*Board of Educ. v.] Allen* [, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968)]") (establishment clause); *Rogers v. Brockette*, 588 F.2d 1057, 1067–71 (5th Cir.), *cert. denied*, 444 U.S. 827, 100 S.Ct. 52, 62 L.Ed.2d 35 (1979) (supremacy clause). *See generally* Comment, *Municipal Corporation Standing to Sue the State: Rogers v. Brockette*, 93 Harv.L.Rev. 586 (1980).

We need not resolve this question, however, because the court below granted the ATAA the

require the Port District to accept condition four.

■ The district court agreed and issued a preliminary injunction in favor of the Port District. On appeal, a preliminary injunction will not be reversed unless the lower court abused its discretion or based its decision on erroneous legal premises. *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980).

CalTrans directs its arguments at the latter half of this test, claiming that the district court erred in relying on the *City of Burbank* case. To assess this claim, we inquire first into the applicable preemption doctrine.

■ The supremacy clause, U.S.Const., Art. VI, Cl. 2, invalidates any exercise of state power that unduly frustrates or obstructs the objectives of legitimate national policy. *Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.*, —— U.S. ——, ——, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981); *Malone v. White Motor Corp.*, 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978); *Hines v. Davidowitz*, 312 U.S. 52, 67–68, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

In assessing any claim brought under this clause, we start from the position "that the historic police powers of the states [are] not to be superseded ... unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). *See also City of Milwaukee v. Illinois*, —— U.S. ——, 101 S.Ct. 1784, 1790, 68 L.Ed.2d 114 (1981); *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977).

■ Where, as here, Congress has not enacted an explicit preemption clause,[8] state authority may still be displaced if an intent to preempt is "implicitly contained in [the federal statute's] structure and purpose." *Jones*, 430 U.S. at 525, 97 S.Ct. at 1309. *See also City of Milwaukee*, —— U.S. ——, 101 S.Ct. at 1790.

Such an intent has been inferred when the state regulations could not be enforced "without impairing the federal superintendence of the field ...." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or when "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice*, 331 U.S. at 230, 67 S.Ct. at 1152. *See also Chicago & North Western Transp. Co.*, —— U.S. at ——, 101 S.Ct. at 1130.

Preclusion of state regulation is possible even in cases where the regulated entity can feasibly comply with both state and federal mandates. *See Ray v. Atlantic Richfield Co.*, 435 U.S. 151 at 157–58, 98 S.Ct. 988 at 994, 55 L.Ed.2d 179; *DeCanas v. Bica*, 424 U.S. 351, 356–57 & n.7, 96 S.Ct. 933, 936–37 & n.7, 47 L.Ed.2d 43 (1976); *Pennsylvania v. Nelson*, 350 U.S. 497, 504–05, 76 S.Ct. 477, 481, 100 L.Ed. 640 (1956).

The key to the scope of federal preemption is the intent of Congress in enacting the applicable federal legislation. *Malone*, 435 U.S. at 504, 98 S.Ct. at 1189; *Retail*

---

status of an intervenor as of right. If the ATAA has standing, then we have jurisdiction to hear the case. *City of South Lake Tahoe*, 625 F.2d at 233. On the present record, we have no trouble finding that the ATAA has standing. It will suffer injury due to service rescheduling, *see* note 13 *infra*, and it has shown also that it is likely that a decree in its favor will redress this injury. *See Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 79, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595 (1978).

8. By contrast, many types of aviation regulation are expressly and exclusively federal. For example, states may not regulate the "rates, routes or services of any air carrier" registered under federal law, 49 U.S.C. § 1305 (Supp. III 1979), and the federal government has declared it is "to possess and exercise complete and exclusively national sovereignty in the airspace of the United States." 49 U.S.C. § 1508(a) (1976).

*Clerks v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 222, 11 L.Ed.2d 179 (1963). If this intent does not appear in the statute, the above cases require us to evaluate the effect of the state action on the federal scheme to see if the state action impairs the objectives of national policy. *Chicago & North Western Transp. Co.*, —— U.S. at ——, 101 S.Ct. at 1130; *Ray*, 435 U.S. at 157–58, 98 S.Ct. at 944; *Hines*, 312 U.S. at 67–68, 61 S.Ct. at 404.[9]

Congress formulates the policies of the national government in its acts and resolutions. Our task is to interpret applicable congressional acts and to define the national policy to discern whether a given state regulation or, for that matter, any state regulation, could be compatible with the attainment of the national policy's objectives. *Jones*, 430 U.S. at 525, 97 S.Ct. at 1309; *DeCanas*, 424 U.S. at 358 n.7, 96 S.Ct. at 937; *Florida Lime & Avocado Growers, Inc.*, 373 U.S. at 142, 83 S.Ct. at 1217. This case requires us to assess the effect of the state regulation on national aviation and aircraft noise policy.

The state regulation in question is easily defined. The state, through its police power, has sought to regulate and restrict aircraft flights directly by requiring the Port District to adopt a more extensive curfew than the Port District itself thought necessary and appropriate.

The interpretation and definition of applicable federal policies is more difficult. National policies with respect to aviation and noise are sufficiently complex that we must consider what is implicit in the federal regulatory scheme, its underlying assumptions, intended purposes, and desired effects. *Jones*, 430 U.S. at 525, 97 S.Ct. at 1309.

Much of this task has been performed by the Supreme Court. In *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973), it held that a local non-proprietary airport curfew was preempted.

At issue was a city's imposition, under its police power, of an 11:00 p. m. to 7:00 a. m. curfew on the operation of Hollywood-Burbank Airport, owned and operated by Lockheed. Lockheed sought to enjoin the city's ordinance, asserting that federal regulation and administrative action had preempted such legislation.

The Supreme Court affirmed this court's and the district court's finding of preemption. After extensively surveying the Federal Aviation Act of 1958 and the Noise Control Act of 1972, the Court found that Congress unequivocally intended that the federal government have "full control over aircraft noise, pre-empting state and local control," *id.* at 633, 93 S.Ct. at 1859, and that this congressional intent left "no room for local curfews or other local controls." *Id.* at 638, 93 S.Ct. at 1862.[10] Further, in order to fulfill the objectives of both acts, "a uniform and exclusive system of federal regulation" was "require[d]." *Id.* at 639, 93 S.Ct. at 1862. Finally, the Court accepted the Solicitor General's statement that the federal government had preempted the field of "airspace management." *Id.* at 627, 639, 93 S.Ct. at 1856, 1862. *See also* 49 U.S.C. § 1348 (1976) (FAA authority over airspace control and facilities). Burbank's curfew was held to invade these preempted areas by regulating both the time when planes could fly and the source of noise

---

**9.** *See generally* Wiggins, *Federalism Balancing and the Burger Court: California's Nuclear Law as a Preemption Case Study*, 13 U.C. Davis L.Rev. 1 (1980); Note, *A Framework for Preemption Analysis*, 88 Yale L.J. 363 (1978); Note, *The Preemption Doctrine: Shifting Perspectives on Federalism and the Burger Court*, 75 Colum.L.Rev. 623 (1975).

**10.** In surveying the applicable legislative history, the Court quoted, 411 U.S. at 635, 93 S.Ct. at 1860, the Senate Report which stated that, under the proposed legislation, "[s]tate and local governments will remain unable to use their police powers to control aircraft noise by regulating the flight of aircraft." S.Rep.No. 1353, 90th Cong. 2d Sess. 6 (1968), *reprinted in* [1968] U.S.Code Cong. & Ad.News 2688, 2694.

emission. *City of Burbank*, 411 U.S. at 638–39, 93 S.Ct. at 1862.[11]

The district court held correctly that *City of Burbank* controls here. Here, as in *City of Burbank*, a governmental entity was attempting to impose a mandatory curfew on an unwilling airport proprietor. Its authority for the curfew derived from the police power, again as in *City of Burbank*.[12] Condition four would affect many flights,[13] whereas the *City of Burbank* curfew affected only one flight per week. *Id.* at 626, 93 S.Ct. at 1856. Stare decisis seems to dictate affirmance.

CalTrans disagrees. It asserts initially that *City of Burbank* is no longer good law because subsequent congressional and administrative actions evince a retreat from the pervasive federal regulation considered in *City of Burbank*. Second, it argues that, even if *City of Burbank* is good law, California fits within an exception desired by Congress and recognized by the Court.

## II. Federal Regulation following *City of Burbank*

Justice Douglas concluded *City of Burbank* by stating that the Court was "not at liberty to diffuse the powers given by Congress to FAA and EPA by letting the States or municipalities in on the planning. If that change is to be made, Congress alone must do it." 411 U.S. at 640, 93 S.Ct. at 1863.

CalTrans asserts that the passage of the Quiet Communities Act of 1978, Pub.L.95–609, 92 Stat. 3079 (1978),[14] demonstrates Congress' intent to reject total federal control of the source of aircraft noise and to involve local governments in the national effort to abate such noise. In essence, this Act provides for a nationwide quiet communities program administered by local government and funded by the federal treasury.

In particular, CalTrans relies on section two of the Quiet Communities Act, which amends the 1972 Noise Control Act relied upon in *City of Burbank*. This section gives the Environmental Protection Agency discretion to disburse funds to local governments for the purpose of:

[D]eveloping abatement plans for areas around major transportation facilities (in-

---

**11.** The Court also stated that "the pervasive nature of the scheme of federal regulation of aircraft noise leads us to conclude that there is preemption." *City of Burbank*, 411 U.S. at 633, 93 S.Ct. at 1859. Although the pervasiveness of federal regulation has been little used recently as an independent ground for finding the congressional intent necessary for completely preempting state regulation, *see, e. g., DeCanas v. Bica*, 424 U.S. 351, 359–60, 96 S.Ct. 933, 938, 47 L.Ed.2d 43 (1976); *New York Dep't of Social Servs. v. Dublino*, 413 U.S. 405, 415, 93 S.Ct. 2507, 2513, 37 L.Ed.2d 688 (1973), it is not a dead letter in preemption analysis. *See Conference of Fed. Sav. & Loan Ass'ns v. Stein*, 604 F.2d 1256, 1260 (9th Cir. 1979), *aff'd mem.*, 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980) (pervasive regulation of federal savings and loan associations evinces congressional intent to exclude state regulatory control).

In any event, it is clear that *City of Burbank* did not rest solely on pervasive regulation. Indeed, the national character of the subject matter was said to be "the critical issue." *City of Burbank*, 411 U.S. at 625, 93 S.Ct. at 1855 (citing *Cooley v. Board of Wardens*, 12 How. (53 U.S.) 299, 13 L.Ed. 996 (1852)). *See also id.* at 639, 93 S.Ct. at 1862.

**12.** The noise regulations seek to regulate unwanted noise for the public good, 21 Cal.Ad-

---

min.Code §§ 5005, 5010 (1977), and apply not just to municipal airports, but to "all existing and future potential airports in California which are [open to the public.]" *Id.* § 5004. This purpose, and the regulations' almost universal application, are both hallmarks of the police power. *See, e. g., New Orleans Gas Co. v. Louisiana Light Co.*, 115 U.S. 650, 661, 6 S.Ct. 252, 258, 29 L.Ed. 516 (1885); *Miller v. Board of Public Works*, 195 Cal. 477, 484–85, 234 P. 381 (1925); 6 E. McQuillin, The Law of Municipal Corporations § 24.04, at 425–26 (3d ed. 1980).

Moreover, the CNEL regulations have been held to be promulgated pursuant to California's "police power control." *Air Transp. Ass'n of America v. Crotti*, 389 F.Supp. 58, 65 (N.D.Cal. 1975) (three-judge court).

**13.** At least five arrivals and four departures daily would be affected directly by the curfew, without accounting for the effect on connecting flights. Clerk's Record at 616, 618, 821.

**14.** *Codified in* 42 U.S.C. §§ 4905, 4910, 4913, 4918, 6901, 6903, 6907, 6913, 6922, 6923, 6925–28, 6947, 6961, 6962, 6964, 6972, 6973, 6977, 6981–6984; 49 U.S.C. § 1431 (Supp. III 1979).

cluding airports, highways, and railyards) and other major stationary sources of noise, *and where appropriate, for the facility or source itself*; .... (emphasis added)

42 U.S.C. § 4913(c)(1)(C) (Supp. III 1979).

CalTrans cites the italicized portion of the statute and argues that Congress has explicitly authorized local governments to regulate the "source" of aviation noise unless such regulation would be in direct conflict with existing federal regulation. We disagree.

The success of CalTrans' argument rests on a strained interpretation of the statute. First, it interprets "sources" in the last phrase to include transitory sources such as airplanes. This is contrary to the statutory scheme, which distinguishes transportation facilities, such as railyards and airports, from stationary sources, such as factories.

Second, CalTrans construes "abatement plans" to include the control of the sources of aircraft noise. This construction was rejected in *City of Burbank* and, as we discuss below, is inconsistent with other parts of the same statute.

Finally, CalTrans' argument that "where appropriate" means "where possible" or "where not in direct conflict with a federal regulation" begs the pivotal question of this appeal, namely, what scope of state regula-

tion is left unpreempted by federal law. If Congress desired the result CalTrans advocates, it could have drafted the statute to avoid these strained constructions.

Instead, in subsection (c)(1), Congress stated that "no actions, plans or programs hereunder shall be inconsistent with existing Federal authority under [the Noise Control Act of 1972] to regulate sources of noise in interstate commerce." This prohibition was written against the background of *City of Burbank*'s holding that federal authority preempted local control of the sources of aviation noise. We hold that Congress intended to continue such preemption.[15]

CalTrans' attempt to interpret the Quiet Communities Act as a blank check for local control of aviation noise stems, in part, from interpreting *City of Burbank* so broadly as to forbid any state control over aviation noise. This reading confuses controlling the source of noise with mitigating its effects.

An object causing noise can be controlled directly, either by restricting its use or by prescribing noise emission standards. *See,* e. g., 14 C.F.R., Part 36 (1980). Quite independently of source control the effects of noise may be mitigated. Examples of such steps are compensating those adversely affected,[16] using the zoning power to assure

---

**15.** We note that other congressional acts subsequent to *City of Burbank* indicate a continuing intent to preclude local regulation. For example, the Aviation Safety and Noise Abatement Act of 1979, Pub.L.No.96–193, 94 Stat. 50 (1980) (to be codified in scattered sections of 49 U.S.C.) provides for the establishment of a national aviation noise measurement system, arguably *superseding local systems such as* CNEL. *Id.* § 102 (to be codified in 49 U.S.C. § 2102).

Once this system is in place, the Act provides for procedures under which airport proprietors may secure federal immunity from excessive aircraft noise liability. *Id.* § 107 (to be codified in § 49 U.S.C. § 2107). Although we believe that the Airline Deregulation Act of 1978, Pub. L.95–504, 92 Stat. 1708 (1978) (codified in scat-

tered sections of 49 U.S.C.) is not directly applicable because of its economic objectives, we note that Congress expressly preempted any state regulation affecting "rates, routes or *services* of any air carrier ...." *Id.* § 4(a), 49 U.S.C. § 1305(a) (Supp. III 1979) (emphasis added). These acts are some indication that Congress has not changed its collective mind regarding the wisdom of forbidding local regulation of the sources of aircraft noise. Indeed, the Aviation Safety and Noise Abatement Act of 1979 may indicate exactly the opposite.

**16.** *See, e. g., Greater Westchester Homeowners Ass'n v. City of Los Angeles,* 26 Cal.3d 86, 160 Cal.Rptr. 733, 603 P.2d 1329 (1979), *cert. denied,* 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980).

harmonious development,[17] baffling existing noise,[18] or resettling those affected by the noise.[19]

As we read *City of Burbank*, Congress has preempted only local regulation of the source of aircraft noise. Local governments may adopt abatement plans that do not impinge on aircraft operations.[20] *See Air Transp. Ass'n of America v. Crotti*, 389 F.Supp. 58, 64–65 (N.D.Cal.1975) (three-judge court) (erection of noise abatement structures and monitoring of aviation noise are permissible).

The *City of Burbank* Court spoke only of noise "control" preemption, 411 U.S. at 633, 638, 93 S.Ct. at 1859, 1862, not preemption of the entire field of aviation noise abatement. *See* U. S. Dep't of Transp., Federal Aviation Admin., Aviation Noise Abatement Policy 34 (1976). Section 611(d)(2) of the Federal Aviation Act of 1958, 49 U.S.C. § 1431(d)(2) (1976), relied upon in *City of Burbank*, authorizes the FAA to "consult with ... Federal, State, and interstate agencies" regarding noise control.

This interpretation of *City of Burbank* is consistent with its underlying rationale. The Court acknowledged that "[c]ontrol of noise is of course deep-seated in the police power of the states," 411 U.S. at 638, but recognized that effective control of aircraft source noise is presumptively a subject for uniform federal regulation. *See, e. g., id.* at 625, 627–28, 639, 93 S.Ct. at 1855, 1856–57, 1862. *See also National Aviation v. City of Hayward*, 418 F.Supp. 417, 425 n.13 (N.D. Cal.1976).

As the Court in *City of Burbank* noted, Congress foresaw that local regulation of airspace use and the sources of aviation noise would "severely limit the flexibility of FAA in controlling air traffic flow," 411 U.S. at 639, 93 S.Ct. at 1862, and would "increase congestion, cause a loss of efficiency, and aggravate the noise problem." *Id.* at 628, 93 S.Ct. at 1857.[21] It was but a short step from these findings to the hold-

---

17. *See, e. g., Wright v. County of Winnebago*, 73 Ill.App.3d 337, 29 Ill.Dec. 347, 391 N.E.2d 772 (1979).

18. *See, e. g., Air Transp. Ass'n of America v. Crotti*, 389 F.Supp. 52, 64–65 (N.D.Cal.1975) (three-judge court).

19. *See, e. g.*, Noise Reg. Rep. (BNA), No. 158, at A–3 (1980); *id.*, No. 162, at A–8 to A–10 (1980).

20. *See, e. g.*, S.Rep.No.1353, 90th Cong., 2d Sess. 7 (1968), *reprinted in* [1968] U.S.Code Cong. & Ad.News 2698, 2694 ("Of course, the authority of units of local government to control the effects of aircraft noise through the exercise of land use planning and zoning powers is not diminished by the bill.") Against this background, the Quiet Communities Act continues the joint participation alluded to. *But see* Aviation Safety and Noise Abatement Act of 1979, Pub.L.96–193, § 107, 94 Stat. 53 (1980) (to be codified in 49 U.S.C. § 2107) (indicating increased federal regulation).

21. Despite these considerations, CalTrans argues that the agencies entrusted by Congress to regulate aircraft noise have abdicated their duties, thus removing *City of Burbank* 's predicate of pervasive federal regulation. In the void purportedly so created, CalTrans asserts state regulation may occur. We find this argument without merit from both factual and theoretical points of view.

In 1976, for example, the United States Department of Transportation issued its report on federal aviation noise abatement policy. It stated: "The federal government has preempted the areas of airspace use and management, air traffic control, safety and the regulation of *aircraft noise at its source*," U. S. Dep't of Transp., Federal Aviation Admin., Aviation Noise Abatement Policy 34 (1976) (emphasis added) [(hereinafter "Noise Abatement Policy")].

The same report concluded that "[s]tate and local governments may protect their citizens through land use controls and other police power measures *not affecting aircraft operations.*" *Id.* (emphasis added). *See also id.* at 31–32.

CalTrans argues, however, that this report adopts the dictum from *Air Transp. Ass'n of America v. Crotti*, 389 F.Supp. 52 (N.D.Cal. 1975) (three-judge court) to the effect that states may use their police power to coerce political subdivisions to use proprietary powers. *See id.* at 64 n.2; Noise Abatement Policy, *supra*, at 33.

The correct interpretation of this language from *Crotti* is discussed below, *see* pp. 1314–1316 *infra*. The main point, however, is that this asserted state authority to coerce is nowhere mentioned in those sections of the report which outline the differing functions

ing that local regulation of the source of aircraft noise was preempted.[22]

In *Air Transp. Ass'n of America v. Crotti,* 389 F.Supp. 58 (N.D.Cal.1975) (three-judge court), the regulatory scheme at issue here was attacked as facially invalid by virtue of federal preemption. The court invalidated

some provisions and let others stand, reserving for a later date their validity as applied.[23] *Id.* at 65.

Brief discussion of three points in the district court decision illustrates its consistency with the result we reach.[24] It used the distinction between direct and indirect con-

---

of proprietors and local governments. *See* Noise Abatement Policy, *supra,* at 34.

Other federal agencies have agreed with the report's conclusion that direct control of the source of aircraft noise is federally preempted. *See* Environmental Protection Agency, Model Noise Control Ordinance § 6.2.8(b) (1979); Environmental Protection Agency, Report on Aircraft-Airport Noise to the United States Senate Committee on Public Works, 93d Cong., 1st Sess. 56–59, 96–97 & 105 (1973); Civil Aeronautics Bd., Implementation of Preemption Provisions of the Airline Deregulation Act of 1978), 44 Fed.Reg. 9948, 9951 (1979).

CalTrans is not helped even if we accept the factual validity of its initial assertion. It falls considerably short of undercutting the regulatory predicate of *City of Burbank* so as to override the presumption of continued validity that we must accord to the definitive interpretation of federal statutes by the Supreme Court.

**22.** The proposition that the federal government has preempted the area of flight control regulation to eliminate or reduce noise has been accepted without contrary authority by numerous courts which have addressed the subject. *See City of Blue Ash v. McLucas,* 596 F.2d 709, 712 (6th Cir. 1979); *British Airways Bd. v. Port Authority of New York,* 558 F.2d 75, 83–85 (2d Cir. 1977); *National Aviation v. City of Hayward,* 418 F.Supp. 417, 420–21 (N.D.Cal.1976); *Air Transp. Ass'n of America v. Crotti,* 389 F.Supp. 58, 62 (N.D.Cal.1975) (three-judge court); *Wood v. City of Huntsville,* 384 So.2d 1081, 1083–84 (Ala.1980); *Greater Westchester Homeowners Ass'n v. City of Los Angeles,* 26 Cal.3d 86, 93–97, 160 Cal.Rptr. 733, 603 P.2d 1329 (1979), *cert. denied,* 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980); *San Diego Unified Port Dist. v. Superior Court,* 67 Cal.App.3d 361, 366–69, 136 Cal.Rptr. 557, *cert. denied,* 434 U.S. 859, 98 S.Ct. 184, 54 L.Ed.2d 132 (1977); *Aaron v. City of Los Angeles,* 40 Cal. App.3d 471, 487–91, 115 Cal.Rptr. 162 (1974), *cert. denied,* 419 U.S. 1122, 95 S.Ct. 806, 42 L.Ed.2d 822 (1975); *Village of Bensenville v. City of Chicago,* 16 Ill.App.3d 733, 306 N.E.2d 562 (1973); *Opinion of the Justices,* 359 Mass. 778, 271 N.E.2d 354 (1971); *Marshall v. Consumers Power Co.,* 65 Mich.App. 237, 237 N.W.2d 266 (1975) (dicta); *Garden States*

*Farms, Inc. v. Bay,* 77 N.J. 439, 390 A.2d 1177 (1978); *Township of Hanover v. Town of Morristown,* 135 N.J.Super. 529, 343 A.2d 792 (1975).

**23.** The court invalidated single event noise level standards [SENEL], which imposed penalties on the owner of any aircraft that exceeded a preset noise level. *See Air Transp. Ass'n of America v. Crotti,* 389 F.Supp. 58, 65 (N.D.Cal. 1975) (three-judge court). The standards were to be enforced by the counties where the transgression took place. *Id.* at 62; Cal.Pub.Util. Code § 21669.4 (West Supp. 1981).

**24.** We give weight to the reasoning of the *Crotti* decision to the extent it is persuasive, but it does not bind us. In any event, we find *Crotti* fully consistent with our analysis.

When a district court is convened as a statutory three-judge panel, it still is sitting as a district court for purposes of stare decisis. *Lewis v. Rockefeller,* 431 F.2d 368, 371 (2d Cir. 1970). The distinctive purpose of a three-judge court as it was conceived and for most of the existence of its statutory authorization was not to add a greater than normal authority or finality to its decision, but rather to ensure that any decision that may enjoin enforcement of statutes be made after more extensive and considered deliberation than a single district judge might have the opportunity to undertake. *See* P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 967–79 (2d ed. 1973); D. Currie, *The Three-Judge District Court in Constitutional Litigation,* 32 U.Chi.L.Rev. 1 (1964).

An unappealed decision of a statutory three-judge court has the same precedential weight for other courts of the district or circuit as any district court decision. *Farley v. Farley,* 481 F.2d 1009, 1012 (3d Cir. 1973); *United States v. Crosson,* 462 F.2d 96, 102 (9th Cir.), *cert. denied,* 409 U.S. 1064, 93 S.Ct. 569, 34 L.Ed.2d 517 (1972); *Russell v. Hathaway,* 423 F.Supp. 833, 835 (N.D.Tex.1976) (three-judge court); *Mazer v. Weinberger,* 385 F.Supp. 1321, 1324 n.4 (E.D.Pa.1974), vacated on other grounds, 422 U.S. 1050, 95 S.Ct. 2671, 45 L.Ed.2d 704 (1975) (three-judge court); 1B J. Moore, Moore's Federal Practice ¶ 0.402[1] n.29 (1980 & Supp. 1980–81).

Because of the parties' extensive discussion of *Crotti,* we add these remarks and those in

trol of aircraft noise to invalidate California's attempt at direct noise regulation. *Id.* at 64–65. Other regulations permitted proprietors to choose a variety of methods to reduce noise. Although a curfew was one option, it was not specifically mandated as it has been here.[25] The court stated that efforts to impose curfews via the state's police power might be suspect but, since the program did not unambiguously require this, it refrained from ruling on the matter. *Id.* at 65.

Finally, the court observed in a footnote that the power of states to regulate political subdivisions was well established. *Id.* at 64 n.2. CalTrans places inordinate interpretive weight on this dictum.

The observation that a state has a power in no way implies any doubt about equally well-settled limits to that power, such as federal preemption. The *Crotti* decision nowhere intimidated that the power to regulate subdivisions was unlimited by the Constitution. *Cf. National Aviation v. City of Hayward*, 418 F.Supp. 417, 421 (N.D.Cal. 1976) ("it seems clear that if this [curfew] was passed by a state . . . not the proprietor of the airport, it would run afoul of *Burbank* . . . .")

Our analysis of the pertinent state and federal regulations leads us to conclude that the curfew imposed by condition four impinges on airspace management by directing when planes may fly in the San Diego area, *City of Burbank*, 411 U.S. at 627, 639, 93 S.Ct. at 1856, 1862, and on federal control of aircraft noise at its source by restricting the permissible flight times of planes solely on the basis of their noise emissions. *Id.* at 633, 638, 93 S.Ct. at 1859, 1862. The state has attempted to act in an area preempted by the federal government and its actions are void.

It is asserted, however, that even if *City of Burbank* is still a correct statement of federal policies, CalTrans fits within a recognized exception to its holding. We next consider that argument.

### III. *City of Burbank*'s Proprietor Exemption

█ The *City of Burbank* Court recognized that Congress singled out airport proprietors and gave them special, although undefined, leeway in controlling the sources of aircraft noise directly. *City of Burbank*, 411 U.S. at 635–36 n.14, 93 S.Ct. at 1860–61 n.14. *See Santa Monica Airport Ass'n v. City of Santa Monica*, 647 F.2d 3 (9th Cir. 1981).

CalTrans asserts it is a proprietor of Lindbergh Field and that the proprietor exception is broad enough to encompass CalTrans' regulations. We need not address the scope of the exception as CalTrans is not a proprietor within the meaning of *City of Burbank*.

The origin of the proprietor exemption appears in a letter by the Secretary of Transportation addressed to the Senate Commerce Committee regarding the 1968 amendments to the Federal Aviation Act. The letter, concurred in by the Committee, stated in part that the "proposed legislation . . . will not prevent airport proprietors from excluding any aircraft on the basis of noise considerations." S.Rep.No.1353, 90th Cong., 2d Sess. 7 (1968), *reprinted in* [1968] U.S.Code Cong. & Ad.News 2688, 2693.

The rationale for this exception is clear. Since airport proprietors bear monetary liability for excessive aircraft noise under *Griggs v. Allegheny County*, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962), fairness dictates that they must also have power to

---

text to explain why the decision is not binding on this appeal and why our holding is fully consistent with *Crotti*.

**25.** In *Crotti*, the state argued in its brief, made part of the record in this case, that the regulations were not mandatory upon proprietors, but

only suggestive. As the state put it, "[S]hould a proprietor choose to act using its unpreempted powers . . . that is the business of the proprietor. The state has nowhere directed that proprietary power be used."

insulate themselves from that liability.[26] But before an entity may possess this power, it must bear the responsibility, either actual or potential, for excessive aircraft noise.[27]

It has not been demonstrated that, under the current allocation of powers, CalTrans would be liable for excessive aircraft noise from Lindbergh Field under *Griggs*. There, the question was whether the county, as owner and operator of an airport, was liable for uncompensated takings of air easements necessary for the airport's operation. The other candidate for liability was the United States, due to its control of all navigable airspace. The Court found that the county was liable for the easements. 369 U.S. at 89, 82 S.Ct. at 533.

Among the bases given in *Griggs* for constitutional liability, or proprietorship for *City of Burbank* purposes, were the county's ability to obtain the necessary approach easements,[28] and its status as promoter, lessor, and operator of the airport.[29] *Griggs*, 369 U.S. at 89, 82 S.Ct. at 533.

These criteria (ownership, operation, promotion, and the ability to acquire necessary approach easements) comprise a federal

definition of proprietors for preemption purposes. To the extent that state law provides these qualities, we inquire into the Port District's status under state law.

The California Legislature created the Port District in 1962. San Diego Unified Port District Act, 1962 Cal.Stats., Ch. 67, 1st Ex. Sess., *codified in* Cal.Harb. & Nav. Code, App. I (West 1978 & Supp. 1981). The Act granted the Port District power to: operate and promote an air terminal, *id.* § 4, govern itself, *id.* § 21, sue and be sued, *id.* § 23, hold real property and make contracts, *id.* §§ 25, 31, condemn private property for public uses, *id.* § 21, as well as tax property for Port District purposes, *id.* §§ 41, 45, 49.5.

California has also granted the Port District power to acquire air easements to alleviate the effect of aircraft noise on local residents.[30] Further, should the Port District desire to expand or begin new construction, the state provides for a limited relocation and compensation program for affected area residents.[31]

Under state law then, the Port District is the owner, operator, and promoter of San Diego Airport. It has the power to acquire

**26.** *British Airways Bd. v. Port Authority of New York*, 558 F.2d 75, 83 (2d Cir. 1977); *Lockheed Air Terminal, Inc. v. City of Burbank*, 457 F.2d 667, 674 n.8 (9th Cir. 1972), *aff'd* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973); Noise Abatement Policy, *supra* note 21, at 32, 50. *See also* 34 Fed.Reg. 18,355 (1969); S.Rep. No.1353, 90th Cong., 2d Sess. 7 (1968), *reprinted in* [1968] U.S.Code Cong. & Ad.News 2688, 2693.

**27.** As stated in the Noise Abatement Policy, *supra* note 21, at 50:

The airport proprietor is closest to the noise problem, with the best understanding of both local conditions, needs and desires, and the requirements of the air carriers and others that use his airport. The proprietor must weigh the costs the airport and the community must pay for failure to act, and consider those costs against any economic penalties that may result from a decision to limit the use of the airport through curfews or other restrictions for noise abatement purposes.

**28.** *See British Airways Bd. v. Port Authority of New York*, 564 F.2d 1002, 1011 (2d Cir. 1977); *Kirk v. United States*, 451 F.2d 690, 694 (10th

Cir. 1971), *cert. denied*, 406 U.S. 963, 92 S.Ct. 2059, 32 L.Ed.2d 350 (1972).

**29.** *See also Lenoir v. Porters Creek Watershed Dist.*, 586 F.2d 1081, 1094–95 (6th Cir. 1978); *Town of East Haven v. Eastern Airlines, Inc.*, 331 F.Supp. 16, 30–32 (D.Conn.1971); *Loma Portal Civic Club v. American Airlines, Inc.*, 61 Cal.2d 582, 585 n.1, 39 Cal.Rptr. 708, 394 P.2d 548 (1964). *Griggs* has been criticized. *See, e. g.*, Note, *Shifting Aircraft Noise Liability to the Federal Government*, 61 Va.L.Rev. 1299 (1975); Note, *Aircraft Noise Abatement: Is There Room for Local Regulation?*, 60 Cornell L.Rev. 269 (1975).

**30.** Cal.Pub.Util.Code § 21652 (West Supp. 1981); Cal.Code Civ.Proc. § 1240.110 (West Supp. 1981); Senate Legislative Committee Comment to Public Utilities Code section 21652, *reprinted in* 58 West's Annotated California Codes, Public Utilities 120 (West Supp. 1981).

**31.** Cal.Gov't Code §§ 7260–7276 (West 1980 & Supp. 1981). *Cf.* Cal.Pub.Util.Code §§ 21690.-20–.29 (West Supp. 1980) (Los Angeles Airport Relocation Program).

air easements for the airport's use and may be sued in its own right. In short, it bears every earmark of proprietorship as recognized in *City of Burbank*.

The state concedes this, but denies that the above analysis establishes the Port District as the *sole* proprietor of the airport facility.[32] California contends that, by virtue of the state's inherent power over its political subdivisions, CalTrans is also a proprietor.

California's extensive grant of powers to the Port District fatally undercuts this argument. The state has seen fit to grant the Port District lands,[33] the ability to sue and

---

**32.** The identity of the proprietor or proprietors of Lindbergh Field has significance beyond *City of Burbank*'s footnote 14. The federal government, appearing amicus curiae, desires to know who the proprietor is for its certification process under 49 U.S.C. § 1432 (1976). Section 1432 certificates are issued to airport operators who meet minimum safety standards, and enable the FAA to enforce its safety regulations. Currently, the Port District is the only entity listed as a proprietor under this certificate procedure. Clerk's Record at 685.

**33.** CalTrans asserts that the tidelands on which Lindbergh Field sits are subject to a public trust of which California is both the settlor and the representative of the beneficiaries. *See City of Coronado v. San Diego Unified Port Dist.*, 227 Cal.App.2d 455, 474–75, 38 Cal.Rptr. 834 (1964), *appeal dismissed*, 380 U.S. 125, 380 S.Ct. 806, 13 L.Ed.2d 792 (1965) (per curiam).

From this premise, CalTrans makes two arguments: first, that its capacity under this trust allows it to direct the activities conducted on the land subject to the trust; and second, that the State Aeronautics Act, which authorizes the regulations at issue here, must be read as a *pro tanto* amendment of the Port District's original tidelands grant.

An inquiry into the scope of California's rights under the tidelands trust theory, *see generally, Marks v. Whitney*, 6 Cal.3d 251, 98 Cal. Rptr. 790, 491 P.2d 374 (1971); Eikel & Williams, *The Public Trust Doctrine and the California Coastline*, 6 Urb.Law. 519 (1974), does not aid our analysis. For purposes of federal proprietorship, the key factor is *Griggs* liability. Nothing in the materials cited by CalTrans or amici indicates that the State of California, as settler and representative of the beneficiaries of the trust, bears fiscal liability for misuse of the Port District's land. At oral argument, counsel for CalTrans explicitly disclaimed such primary liability. Without such liability, however, congressional intent, as found in *City of Burbank*, precludes control under the police power, and CalTrans' argument fails.

CalTrans' *pro tanto* amendment theory suffers a similar fate. In addition to not resolving the question of *Griggs* liability, the authorities cited by CalTrans and the state are of no help. The state asserts that *People ex rel. San Francisco Bay Conservation & Dev. Comm'n v.*

*Town of Emeryville*, 69 Cal.2d 533, 72 Cal.Rptr. 790, 446 P.2d 790 (1968), and *Mallon v. City of Long Beach*, 44 Cal.2d 199, 282 P.2d 481 (1955), stand for the proposition that any act by the state legislature automatically affects every tideland grant. While we recognize that the authority to rescind such grants remains in the legislature, *see* Eikel & Williams, *supra*, at 552–53, we find these cases inapposite.

In *Emeryville*, for example, the legislature had created a special commission especially for the administration of tidelands in the San Francisco Bay area. In upholding an injunction in favor of the special commission and against Emeryville, the titleholder of the lands, the court held that the legislature retained the power to amend tideland grants when to do so would serve the "general statewide interest." 69 Cal.2d at 549, 79 Cal.Rptr. 790, 446 P.2d 790. But there the affected lands were specifically mentioned in the superseding legislation, and the result was within the intent of the legislation.

Here, by contrast, the tidelands are not mentioned in the State Aeronautics Act, nor does it appear in that act that the legislature intended to use its power over California's tidelands to achieve the objectives of the legislation.

*Mallon* involved similar facts. There, the City of Long Beach sued to recover profits from natural resources located in the tidelands. The state legislature had by state law allocated them to the state, and the California Supreme Court held that the legislature had the power to make that amendment to the initial grant of the tidelands. 44 Cal.2d at 207, 282 P.2d 481.

Neither case contains language supporting the proposition that each of the many acts of the California legislature automatically affects the terms of every tidelands grant made since 1850. The result would be utter chaos, and we do not attribute that to California's legislature.

The cases cited by CalTrans and amici are better read to stand for the proposition that legislation may specifically alter a municipality's tidelands grant. Here, the scope of the trust would not allow CalTrans to direct the Port District's activities because we have not been shown that the state legislature specifically exercised its power over the Port District's tidelands when enacting the State Aeronautics Act.

Further, the legislature addressed itself to the particular lands at issue here when it created

be sued, and the power to operate and plan the airport. The district court found that, due to this delegation of authority, the state had no primary liability. 457 F.Supp. at 293–94. As the Port District is comprised of five San Diego area cities,[34] California's actions have passed any potential aircraft noise liability from all of the state's residents to the residents of these five constituent cities.

*City of Burbank*'s proprietor exception looks to who will pay for the taking of air easements. The state, through the Port District Act, has unequivocally stated that the Port District and the residents of its constituent cities will foot the bill.[35] Since CalTrans bears no liability for excessive aircraft noise at Lindbergh Field, it is not now a proprietor under federal law, and cannot avail itself of *City of Burbank*'s footnote 14.[36]

Moreover, state law precludes the argument that CalTrans and the district are dual proprietors. Section 21632 of the California Public Utilities Code provides:

> [CalTrans] shall not acquire any airport . . . owned or controlled by a political

subdivision . . . without the consent of the political subdivision.

This constitutes a procedural barrier that the state has erected to its acquisition of Lindbergh Field and, derivatively, to the assumption of proprietorship status.

CalTrans makes the final argument that, since the state could install CalTrans as operator and proprietor of Lindbergh Field by statute, the state can exercise the lesser power of assuming the proprietor's function of direct flight regulation. The argument fails because it confuses the existence of power with its exercise. The state cannot confer proprietor status on CalTrans simply by a course of dialectics when its own political system forbids that result.

The judgment is AFFIRMED.

---

the Port District in 1962. It said that the Port District "shall hold such lands in trust for the uses and purposes and upon the conditions which are declared in this act." Cal.Harb. & Nav.Code, App. I, § 14 (West 1978).

The uses, purposes and conditions included the "acquisition, construction, maintenance, operation, development and regulation of . . . air terminal facilities" and the promotion of "commerce, navigation, fisheries and recreation . . . ." *Id.* § 4. *See also id.* § 87. The terms of this grant have not been explicitly amended since the Port District's creation, and we decline to do so now.

**34.** The cities of Chula Vista, Coronado, Imperial Beach and National City select one commissioner each to sit on the Port District's governing board. San Diego, due to its relative size, selects three commissioners for a total of seven. Cal.Harb. & Nav.Code, App. I, § 16 (West 1978).

**35.** It may by true that California could assume liability for excessive noise at Lindbergh Field, but we deal in actualities and not possibilities. California has four methods for its political subdivisions to pay judgments, *see* Cal.Gov't Code §§ 970–991.2 (West 1980 & Supp. 1981).

Absent these, a subdivision may declare bankruptcy under Chapter Nine of the Federal Bankruptcy Act to eradicate its debt. *See* 11 U.S.C. §§ 901–946 (Supp. III 1979).

Nowhere is it mandated that the state will be ultimately liable for the Port District's judgments. The Port District, without further and uncertain state action, bears alone the brunt of aircraft noise liability. As such, it is the proprietor for purposes of *City of Burbank*'s footnote 14.

**36.** In its reply brief CalTrans argued, for the first time, that this interpretation of federal law would render it unconstitutional under *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). CalTrans did little more than cite *National League of Cities*, however, and we are left to guess precisely what it meant to argue.

Under these circumstances we may not consider the question. *Levy v. Urbach*, 651 F.2d 1278, 1280–1281 n.3, (9th Cir., 1981). CalTrans' "failure to present a coherent argument removes the point from our permissible range of inquiry." *Id.*