Decided August 3, 1987

COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS
COMMONWEALTH TRIAL COURT

| | | |
|---|---|---|
| MARIANAS PUBLIC LAND TRUST, | ) | CIVIL ACTION NO. 85-372 |
| Plaintiff, | ) | |
| vs. | ) | ORDER |
| COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS and COMMONWEALTH PORTS AUTHORITY, | ) | |
| Defendants. | ) | |

This matter was commenced by the Marianas Public Land Trust (Trust) for the purpose of challenging the validity of Section 6 of the Emergency Appropriations Act of Fiscal Year 1985 (Public Law 4-54) which, inter alia, declared that $1,200,000 be paid to the Commonwealth Ports Authority (CPA) from the escrow account created by Article 4 of the Land Acquisition and Deferred Payment Agreement between the Commonwealth of the Northern Mariana Islands, the Marianas Public Land Corporation (MPLC) and the United States of America. By way of a preliminary injunction, this court stopped the payment of the money and that has been the status of that portion of this lawsuit to date.

After the preliminary injunction was entered, CPA filed its answer and a counterclaim which is the basis of the present

**121**

motion by CPA for summary judgment against the Trust. The counterclaim of CPA alleges that it is the fee owner of the land upon which the West Tinian International Airport (Tinian Airport) is situated and therefore it is entitled to a portion of the lease payment made by the United States to the Government of the Commonwealth. The money claimed by CPA is not the escrowed account referred to in Section 6 of Public Law 4-54, but money now held by the Trust.

## THE FACTS

The essential facts for the resolution of CPA's motion are not in dispute.

In 1975 the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (Covenant) was approved. Pursuant to Sections 802 and 803 of the Covenant, the Government of the Northern Mariana Islands agreed to lease certain land on Tinian for an established amount to the United States of America if the latter exercised its option. The Tinian Airport is within the area referred to in the Covenant to be leased to the United States.

On July 22, 1977 a deed was executed by the Government of the Northern Mariana Islands which transferred fee simple title of the Tinian Airport to the Mariana Islands Airport Authority (the predecessor of CPA) subject however, to the provisions of Section 802 of the Covenant. The deed also granted to the grantee the right to all rents from the premises.

122

Thereafter, on January 9, 1978 the Constitution of the Commonwealth of the Northern Mariana Islands came into effect. Pertinent to this matter are the provisions encompassed in Article XI, Sections 5 and 6 which provide that all monies received from public lands shall be paid to MPLC and then paid over to the Trust after MPLC has deducted expenses for its administration.

The United States of America exercised its option to lease the Tinian land and on January 6, 1983 a Land Acquisition and Deferred Payment Agreement and Tinian Lease Agreement were entered into by the United States, MPLC and the Commonwealth Government. These Agreements were approved by CPA since it was recognized that CPA was the fee owner of the Tinian Airport. A little over $26,000,000 was paid by the United States to MPLC and subsequently most of this money was paid to the Trust. The balance of the money for the rental of the land is that which is the subject of the Trust's complaint, which as noted above, is not at issue in this dispute between the Trust and CPA. CPA's demand is that the Trust pay $1,200,000 out of the money it has received from MPLC to CPA.

## THE POSITIONS OF THE PARTIES

The Trust concedes that were we to look solely at the 1977 deed, CPA would be entitled to a pro-rata share of the money paid by the United States. However, it is asserted that two subsequent events alter this result - the implementation of the Constitution of the Commonwealth and the approval by CPA of the Lease Agreement with the United States.

123

Succinctly put, the Trust argues that the Constitution extinguished the rights to the rental which CPA had and dictated that the rental from the Tinian Airport, being public land, be received by MPLC pursuant to Article XI. Neither the Constitution nor the Covenant provides that CPA is to obtain any share of the United States rental monies. Additionally, the Trust argues that by the approval of the lease agreement with the United States, CPA expressly agreed that the money would be paid to MPLC and then to the Trust and once the Trust received the money, it is immune from any claim of CPA.

CPA argues that the subsequent implementation of Article XI of the Constitution cannot take away its pre-existing right to the rentals from the subject land. It is also asserted the Covenant assures that it obtains the rent and a review of the history of the above facts clearly indicates all along that the Commonwealth Government acknowledged and agreed that CPA was entitled to its pro-rata share of the rental money.

## DISCUSSION

This case presents a monumental struggle between two important entities operating within the constitutional and statutory framework of the Commonwealth Government. The Trust has the obligation to safeguard and invest the funds it receives from MPLC pursuant to Article XI of the Constitution. Its creation and existence is constitutionally ordained. All income except necessary expenses of administration of the Trust is paid into the general fund of the Commonwealth for the benefit of the people of the

**124**

Commonwealth. The Trustees are held to the usual high standards expected of trustees of a trust. Thus, it is not surprising to see the Trust zealously guarding the principal from dilution - no matter which entity claims the money.

On the other hand, CPA has the important function of operating and maintaining the ports and airports of the Commonwealth 2 CMC § 2122.

After receiving title to the Tinian Airport, CPA expended funds to improve the airport. From revenues CPA generates, it pays its operation expenses and does not rely upon legislative appropriations for support. CPA asserts that it has relied upon the $1,200,000 to finance its operations.

## A.   ISSUE - IS THE TINIAN AIRPORT PUBLIC LAND?

CPA argues that the land deeded to it in the 1977 lease is not public land and therefore it is not subject to the provisions of Article XI of the Commonwealth Constitution.

However, it is clear that the subject land is public land. The very deed which CPA relies upon, acknowledges the existence of Department of Interior Secretarial Order 2989 for the authority or source of title for the Government of the Northern Mariana Islands to deed the property over to CPA's predecessor. Secretarial Order 2989 was the order whereby public lands of the Trust Territory, including the Tinian Airport, were transferred to the Resident Commissioner of the Northern Mariana Islands.

The Tinian Airport is within the definition of public lands as stated in Article XI, Section 1 of the Commonwealth

Constitution because the provision specifies land transferred pursuant to Secretarial Order 2989 and includes land transferred to or by the Government of the Northern Mariana Islands under Article VIII of the Covenant.

The argument CPA makes is that the implementation of the Commonwealth Constitution subsequent to its 1977 deed cannot define public land so that the effect is to take away a pre-existing right. This argument is related to the next issue to be resolved to which the court now turns.

### B. ISSUE - WHAT IS THE EFFECT OF THE IMPLEMENTATION OF THE COMMONWEALTH CONSTITUTION ON THE RIGHT OF CPA TO RECEIVE RENTALS FROM THE TINIAN AIRPORT?

As indicated above, there is no dispute that if a grantee is given fee title, the right to rentals from the property follows the title. Indeed, the 1977 deed specifies the grantee CPA is entitled to any rentals from the land. It is the subsequent events which take this case out of the ordinary run of the mill property law concept. Once the conclusion has been reached that the subject land is public land, CPA must argue that Article XI is not applicable because its implementation destroys its right to the United States lease money which was apparently inviolate when it received its fee interest in 1977. This argument is premised on the theory that the enforcement of Article XI would be an unconstitutional impairment of a contract obligation, deprive it of due process and implement, in effect, an ex post facto law.

CPA is a public corporation and its functions are govermental and public. 2 CMC § 2121. It can hold title to

126

land in its own name. 2 CMC § 2122(p). When CPA took title to the Tinian Airport, it knew it was obligated to execute a lease of the premises if the United States exercised its option to lease the property pursuant to Section 802 of the Covenant. There is nothing in the 1977 lease which states that CPA will **specifically** receive anything for carrying out its obligation to lease the airport to the United States. However, the paragraph regarding the general right of CPA to receive the rents from the premises would, without considering anything else, give CPA that right.

██ Since the 1977 deed specifically subjected the grant of the land to CPA to the provisions of 802 of the Covenant, it is clear that the grantor and grantee knew that those provisions prevailed over any general provisions. Section 802 is so intertwined with Section 803(a) and (b) that CPA knew at all times that any money paid by the United States would be to the Government of the Northern Mariana Islands. This payment process is further substantiated in the Technical Agreement Regarding Use of Land to Be Leased by the United States in the Northern Mariana Islands (Technical Agreement) Part I.2. Indeed, if the civilian air terminal for the Tinian Airport is to be relocated, the United States will reimburse the Government of the Northern Mariana Islands. Part I(6). The 1977 deed is specifically subject to the provisions of the Technical Agreement.

Thus when the 1983 lease agreement was executed, the United States did what it was obligated to do - pay the money to the

**127**

Government of the Northern Mariana Islands. This meant that pursuant to Article XI, the money was directed to MPLC. This is reconfirmed in the Tinian Lease Agreement, Article 5 b. CPA expressly approved this procedure by signing the Land Acquisition Agreement and the Tinian Lease Agreement.[1] Actually CPA had no choice. It had to execute the agreement with the United States because the 1977 deed required them to do so. It had to acknowledge that MPLC was the proper recipient of the funds because of Article XI of the Constitution.

MPLC subsequently paid the money CPA claims over to the Trust. MPLC had no other choice either because of the constitutional provisions of Article XI.

CPA attempts to show through correspondence that CPA always expected or believed that it would get a share of the money. This proposition can be summarily disposed of. Any such understanding or belief by CPA or promises by executive branch officials cannot alter or modify the plain and unambiguous wording of the 1977 deed or the Tinian Lease Agreement. Nor can any collateral promises overcome the plain meaning and import of the provisions of Article XI of the Constitution.

Of more substance is the argument of CPA that the subsequent implementation of the Commonwealth Constitution took away its "vested" right to its portion of the United States rental payment.

---

[1] These agreements are set forth in full in the Commonwealth Code, pages C-401 to C-411 and C-501 to C-506.

The general rule is that an instrumentality of a government, which is created by the government, cannot assert constitutional rights in relation to the government that has created it. *City of Trenton v. State of New Jersey*, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923); *City of Newark v. State of New Jersey*, 262 U.S. 192, 43 S.Ct. 539, 67 L.Ed. 943 (1923); *Williams v. Mayor and City Council of Baltimore*, 289 U.S. 36, 53 S.Ct. 431, 77 L.Ed. 1015 (1933); *City of New York v. Richardson*, 473 F.2d 923 (2d Cir. 1973); and *Delta Special School District v. State Board of Education*, 745 F.2d 532 (8th Cir. 1984).

CPA is no doubt a political subdivision of the very government it now seeks constitutional redress. However, CPA attempts to distinguish the authorities cited by the Trust by arguing that the cases are all premised on the 14th Amendment of the United States Constitution and here, CPA relies not on the 14th Amendment but on the Commonwealth Constitution which prohibits the impairment of contract rights. CPA also argues that the constitutional rights guaranteed in Section 102 of the Covenant prevail over the Commonwealth Constitution.

It is further asserted that a preemption has more or less occurred which, as the court understands the argument, means the Covenant and Article I of the Commonwealth Constitution preempt the provisions of Article XI. Cited for this argument are *South Macomb Disposal Authority v. Township of Washington*, 790 F.2d 500 (9th Cir. 1986) and *San Diego Unified Port District v. Gianturco*, 651 F.2d 1306 (9th Cir. 1981). Neither

129

of these cases aids CPA in its argument. <u>Gianturco</u> concerned the preemption of legitimate national policy goals over the attempted exercise of state power. In a footnote, the court indicated that there may be times a political subdivision can sue its maker on constitutional grounds. <u>South Macomb</u> recognized the general rule enunciated in <u>City of Newark v. New Jersey</u> and <u>City of Trenton v. New Jersey</u>, supra, and went on to indicate that there may be occasions when the political subdivision may challenge the constitutionality of state legislation.[2]

However, what is involved here is not a state statute that is claimed to be unconstitutional but the Constitution itself.

This crucial fact eliminates even the possibility of suit in those cases referred to in <u>South Macomb</u> and <u>Gianturco</u>. The reason for this is straightforward. It is the Commonwealth Constitution which defines "public land" and requires the United States rental payment be made to MPLC and to the Trust. The Covenant does not alter or modify this.

CPA is a creature of a statute. 2 CMC, Division 2. The statute was enacted by the Commonwealth Legislature and signed into law by the Governor. This event occurred because the Commonwealth Constitution allowed for it. When CPA came into existence it necessarily became subject to the same

---

[2] A review of the cases cited in <u>South Macomb</u> at pp. 504-505 reveals that all of the cases involve a political subdivision challenging the constitutionality of a state statute or a statute/regulation of another political subdivision. There are no cases whereby a political subdivision has tried to set aside a constitutional provision.

Constitution which provided the means for its creation. Therefore, whether CPA invokes or does not invoke the 14th Amendment of the United States Constitution is of no moment.

If somehow a political subdivision could declare portions of a constitution "unconstitutional" or inapplicable to it, the proverbial tail would be wagging the dog. CPA has provided no authority for this proposition and it would indeed be surprising if any existed. It is held that any political subdivision of the Commonwealth Government does not have standing to claim that any portions of the Commonwealth Constitution is not applicable to it because of an asserted deprivation of constitutional rights as the Constitution applies to the political subdivision.

Once it is concluded that Article XI cannot be circumvented by CPA, the other arguments made by CPA such as equitable estoppel need not be addressed. CPA may or may not have a claim against some other political entity but it certainly has no claim against the Trust. The latter has done nothing more than follow the Constitution - the same document CPA is bound by and required to observe.

The Motion of CPA for Summary Judgment is DENIED.

Dated at Saipan, CM, this 3rd day of August, 1987.

Robert A. Hefner, Chief Judge